**VIRGINIA:**

In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond, on Tuesday, the 12th day of June, 2007.

John Allen Muhammad,                                          Petitioner,

    against          Record No. 061428

Warden of the
 Sussex I State Prison,                                    Respondent.

Upon a Petition for a Writ of Habeas Corpus

Upon consideration of the petition for a writ of habeas corpus filed July 31, 2006, the respondent's motion to dismiss, and the petitioner's reply to that motion, the Court is of the opinion that the motion should be granted and the writ should not be issued.

John Allen Muhammad was convicted in the Circuit Court of Prince William County of one count each of conspiracy to commit capital murder, use of a firearm while committing or attempting to commit capital murder, and two counts of capital murder for the murder of Dean Meyers as more than one murder in three years, and the murder of Dean Meyers in the commission of an act of terrorism. Finding that the Commonwealth had proven the aggravating factors of "future dangerousness" and "vileness" beyond a reasonable doubt, see Code § 19.2-264.2, the jury fixed Muhammad's sentence at death on each of the capital murder convictions and fixed sentences totaling thirteen years' imprisonment for the non-capital convictions. The trial court sentenced Muhammad in accordance with the jury's verdict. This Court affirmed Muhammad's convictions and

the sentences of death.  Muhammad v. Commonwealth, 269 Va. 451, 619 S.E.2d 16 (2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2035 (2006).

In claim (I), petitioner alleges that his Fifth, Eighth[1] and Fourteenth Amendment rights, and corresponding rights under the Virginia Constitution were violated by the Commonwealth's failure to disclose exculpatory information to petitioner as required by Brady v. Maryland, 373 U.S. 83 (1963).

As the Court has stated previously, and reiterated in our opinion affirming petitioner's conviction and sentence of death:

> In Brady [], the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Whether evidence is material and exculpatory and, therefore, subject to disclosure under Brady is a decision left to the prosecution. Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). Inherent in making this decision is the possibility that the prosecution will mischaracterize evidence, albeit in good faith, and withhold material exculpatory evidence which the defendant is entitled to have under the dictates of Brady. If the defendant does not receive such evidence, or if the defendant learns of the evidence at a point in the proceedings when he cannot effectively use it, his due process rights as enunciated in Brady are violated. United States v. Russell, 971 F.2d 1098 (4th Cir. 1992); United States v. Shifflett, 798 F. Supp. 354 (1992); Read v. Virginia State Bar, 233 Va. 560, 564-65, 357 S.E.2d 544, 546-47 (1987).

---

[1] The Court rejects petitioner's claim that the Eighth Amendment of the United States Constitution supports his claim that he should be granted habeas relief because the Commonwealth failed to disclose allegedly exculpatory information. Petitioner has failed to establish that such a failure implicates the Eighth Amendment.

2

. . . .

>Exculpatory evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. "A reasonable probability" is one which is sufficient to undermine confidence in the outcome of the proceeding. United States v. Bagley, 473 U.S. 667, 682 (1985); Robinson v. Commonwealth, 231 Va. 142, 151, 341 S.E.2d 159, 164 (1986).

Muhammad, 269 Va. at 510, 619 S.E.2d at 49-50 (quoting Bowman v. Commonwealth, 248 Va. 130, 133, 445 S.E.2d 110, 111-12 (1994)).

In the first portion of claim (I), petitioner contends that the Commonwealth was required to, but did not, disclose an FBI Criminal Investigative Analysis, which stated in part: "There is likely only one offender. Sniper attacks are generally a solitary type of murder. It would be extremely unusual for there to be multiple offenders in this series of attacks." Petitioner states he did not receive this information until his prosecution in Maryland on related offenses.

The Court need not resolve questions related to when the Commonwealth knew of the analysis, whether the knowledge of the FBI should be imputed to Prince William prosecutors, or whether the analysis was material because the Court holds that the analysis was not favorable to petitioner. The record, including the full text of the analysis, demonstrates that the paragraph describing

3

"offender characteristics" upon which petitioner relies actually states:

> There is likely only one offender. Sniper type attacks are generally a solitary type of murder. It would be extremely unusual for there to be multiple offenders involved in this series of attacks. *If there is a second offender, he is not likely to be an equal partner in these crimes, and would be subservient to the primary offender.* (Emphasis added).

In whole, this statement supports the evidence admitted at trial and the Commonwealth's theory of the case. Therefore, the portion of the statement, taken in context, is not exculpatory.

In another portion of claim (I), petitioner contends that the Commonwealth was required to, but did not, disclose a memorandum attacking the credibility of a witness to the shooting of Baton Rouge, Louisiana citizen, Hong Im Ballenger. The memorandum was prepared by the Baton Rouge Police Department in response to a news report, which aired on a Louisiana television station. The news report referred to the witness by a pseudonym, "Frances" and the memorandum upon which petitioner relies includes a transcript of the report and written "factual" responses. Petitioner believes that "Frances" and Ingrid Shaw, who testified concerning the Ballenger murder during his trial, are the same person. Petitioner states he did not receive this memorandum until his prosecution in Maryland on related offenses.

4

The Court need not resolve questions related to when the Commonwealth knew of the analysis, whether the knowledge of the Baton Rouge Police Department should be imputed to Prince William prosecutors, or whether the memorandum was material because the Court holds that petitioner has failed to establish that the memorandum was evidence favorable to petitioner. Petitioner speculates, but fails to prove, that "Frances" and Ingrid Shaw are the same person. Furthermore, evidence at trial proved that the bullet that killed Ballenger was fired from petitioner's Bushmaster rifle.

In another portion of claim (I), petitioner contends that the Commonwealth was required to, but did not disclose the development of a suspect, Louis Robinson, in the Ballenger murder. Petitioner includes page three from supplement number eight to the police report in the Ballenger investigation, which indicates that the Baton Rouge police found Robinson as a result of bloodhound tracking that ended between Robinson's house and another house. When police encountered Robinson the next day, he had a knife in his hand, which, along with another knife and pair of tennis shoes with blood-like stains, was seized.

The Court need not resolve questions related to when the Commonwealth knew of this information, whether the knowledge of the Baton Rouge Police Department should be imputed to Prince William

5

prosecutors, or whether this information was material because the Court holds that this information was not favorable to petitioner. The record, including the full police report, demonstrates that, although Robinson was a suspect, police did not believe he was the killer because the stains on his tennis shoes were not blood, Robinson had no gun shot residue on his hands, and Shaw did not identify him in a photographic line-up. Furthermore, evidence at trial proved that a bullet fired from petitioner's Bushmaster rifle killed Ballenger.

In another portion of claim (I), petitioner contends the Commonwealth was required to, but did not, disclose the contents of supplement number sixteen to the Baton Rouge investigation file concerning the Ballenger murder. Supplement sixteen contains a summary of the numerous suspects and tips received by the Baton Rouge Police Department, the investigation concerning these suspects, and the resolution of the case.

The Court need not resolve questions related to when the Commonwealth knew of this information, whether the knowledge of the Baton Rouge Police Department should be imputed to Prince William prosecutors, or whether this information was material because the Court holds that this information was not favorable to petitioner. The record, including the full police report, demonstrates that police identified several suspects during the course of the

6

investigation, that each suspect was eliminated as a possibility, and that, after petitioner was arrested for the Virginia and Maryland sniper shootings, it was determined that he and Lee Boyd Malvo had been in Baton Rouge at the time of the Ballenger murder and ballistics tests confirmed that the bullet which killed Ballenger was fired from the Bushmaster rifle used in the sniper attacks.

In another portion of claim (I), petitioner contends that the Commonwealth was required to, but did not, disclose the contents of investigative reports in connection with the wounding of Caroline Seawell. The record, including the trial transcript, demonstrates that a witness to the Seawell wounding, Alex Jones, witnessed the shooting while waiting for Seawell's parking place. Jones initially got out of his car to check on Seawell and then decided to get help and to protect himself and his wife. He returned to his car and drove it in a zigzag pattern through the parking lot until he drove up behind a "dirty" Chevrolet being driven very slowly. Jones could not drive around the car and had to drive slowly behind it until the car turned one direction and Jones was able to turn the opposite direction and drive to a local furniture store to get help.

While Jones was behind the car, he noticed that the windows were too dark for the interior of the car to be seen, and Jones was

frightened and "felt" that the car did not belong there. He testified that he noted the license plates were from New Jersey and that he "was trying to get the numbers but [] was a little frightened because [he] was only about a half a car away, and [he] didn't want anybody in the car – . . . – [he] didn't want to give whoever was looking at [him] the impression that [he] was trying to get their license plate. . . ."

On cross-examination, after having been shown close-up photographs of the vehicle, Jones testified that he was about 80% sure the picture was of the vehicle he had seen because he "kind of remember[ed] those letters; but that was the car." Jones admitted he had did not tell the police officers about the three letters and that the first time he told anyone about remembering the letters was that moment at trial. Petitioner contends the Commonwealth should have provided the FBI report that indicated that Jones "could provide no additional information about the license plate number" other than that it was a New Jersey license plate.

The Court need not resolve questions related to whether the knowledge of the FBI should be imputed to Prince William prosecutors, or whether this information was material because the Court holds that this information was not favorable to petitioner. The record, including the trial transcript and the FBI report proffered by petitioner, demonstrates that the witness was not

8

expected to testify concerning the license plate number. As expected, the witness testified on direct examination that he tried to get the number but was too frightened; and that after being shown the picture of the license plate and "remembering" the letters on cross-examination, the witness admitted he had never informed the police that he knew the letters of the license plate number. The FBI report is consistent with the witness' testimony. The petitioner was able to successfully have the witness testify that he did not previously inform the FBI of his memory. Furthermore, the evidence at trial proved that a bullet fired from petitioner's Bushmaster rifle wounded Seawell.

In another portion of claim (I), petitioner contends that the Commonwealth was required to, but did not, disclose the contents of investigation reports in connection with the shooting death of Kenneth Bridges in Spotsylvania County. The record, including the trial transcript, demonstrates that a witness, Christine Goodwin, saw the Chevrolet Caprice parked at an odd angle at the Exxon station where Bridges was killed. She paid special attention to this car because it had New Jersey plates and was parked at an odd angle in a corner of the lot, the paint was peeling, and the windows were covered with a dark tint, such that she could not see the interior, except for the dashboard, which was strewn with papers on the passenger side. Goodwin was nervous about the car and

almost stopped getting gas, but a police cruiser pulled into the lot and she felt safer.

Later after the shooting was made public and Goodwin saw a report that the police were seeking a Chevrolet Caprice, she contacted the hotline. On cross-examination, Goodwin noted that she read the license number and it began with the letter "N" and that she had made a mental note of it. Petitioner contends the Commonwealth should have provided a Spotsylvania County police report, which indicated that Goodwin "could not remember any of the tag number."

The Court need not resolve questions related to whether the knowledge of the Spotsylvania Sheriff's Office should be imputed to Prince William prosecutors, or whether this information was material because the Court holds that this information was not favorable to petitioner. The record, including the trial transcript and the report proffered by petitioner, demonstrates that the witness was not expected to testify concerning the license plate number and that, as expected, the witness testified on direct examination that she recognized the car by its description and because it bore license plates from New Jersey. It was not until cross-examination after the witness was shown pictures of the car that she testified she "remembered" the "N." Furthermore, evidence at trial proved that a bullet fired from petitioner's Bushmaster

rifle killed Bridges.

In another portion of claim (I), petitioner contends the Commonwealth was required to, but did not, disclose the contents of investigative reports in connection with the wounding of Kellie Adams and the death of Claudine Parker in Montgomery, Alabama. The record, including the trial transcript, demonstrates that James A. Gray was standing across the highway from the location of the shooting and took chase of Malvo after it appeared that Malvo was going to get away from police officers. Gray chased Malvo through a ditch and attempted to "cut him off" from the path he was running, eventually coming face-to-face with Malvo before losing him. Gray testified that, at the time, Malvo did not appear to be a black man, but instead appeared to be "very fair" and possibly bi-racial. Gray was later called back to Montgomery to look at a photo line-up, from which Gray picked out Malvo's picture. Gray testified that he told the police officers that the person in the picture was not the right color. Defense counsel asked Gray if he stated the picture was "a good likeness" to which Gray admitted he "might have said that."

Petitioner contends that he was unaware that Gray had described the person he chased as a black male who was holding a pistol, as documented in a report prepared by Detective W.D. Favor of the Montgomery Police Department. Petitioner contends further

11

that Gray told Detective Favor conflicting information later that same day. The record, including the exhibits proffered by petitioner, demonstrates that Detective Favor prepared a report detailing his investigation in which he stated that Gray had come to the police station at approximately 3:30 p.m. and in which Detective Favor reports the contents of Gray's statement to him. The transcript of the statement made "later that day" to which petitioner refers, indicates that the interview with Gray actually began at 4:06 p.m.

Contrary to petitioner's contention, the Court finds that the report written by Detective Favor summarizes the interview he conducted with Gray, and that the references to Gray's alleged assertion that he was chasing a black man holding a pistol are a result of Favor's inaccurate recollection of the statements actually made by Gray and reflected in the transcript of the interview. The portions of Detective Favor's recollection, which are not supported by the transcribed version of the interview, do not constitute exculpatory evidence because they would have been inadmissible and would not have led to the discovery of exculpatory evidence as evidenced by Gray's actual statements to Favor and his consistent testimony.

Petitioner further contends that the prosecutor should have provided him with a copy of Gray's October 24, 2002 interview

during which he selected Malvo's photograph from a photo line-up. The record, including the trial transcript, demonstrates that petitioner's attorney used the transcript of the October 24, 2002 interview in his cross-examination of Gray and quoted directly from it. Thus, this evidence was not withheld from petitioner and does not constitute a Brady violation.

Finally, petitioner contends that the prosecution should have provided to him the statements made by Clyde Wilson, a man who was with Gray when the shooting occurred, but whom Gray did not know, and who also gave chase. Petitioner argues that Gray's testimony could have been impeached by evidence that Clyde Wilson described the suspect as wearing a green or turquoise shirt and that Wilson could not identify Malvo in the photo line-up. The record, including Wilson's statements and the trial transcript of Gray's testimony, demonstrates that Wilson followed a different route in his attempt to aid police, thus, Wilson and Gray viewed the suspect from different vantage points. Gray had the opportunity to look at Malvo face-to-face, while Wilson did not. The Court holds that this evidence could not properly be used to impeach Gray's testimony and, as Wilson did not testify, no Brady violation occurred. Furthermore, the evidence proved that Parker and Adams were shot with bullets fired from petitioner's Bushmaster rifle and that Malvo dropped a .22 caliber handgun, which contained his

13

fingerprints, while he was running.

In another portion of claim (I), petitioner alleges the Commonwealth was required to, but did not, disclose the contents of witness statements in connection with the shooting death of Paschal Charlot in the District of Columbia on October 3, 2002. The record, including the trial transcript, demonstrates that Gail Howard testified that she saw a car parked in her parking lot at the time of Charlot's murder that looked "pretty much like" the car in which petitioner and Malvo were arrested. After she heard a gun shot, she observed the car leave the area, moving slowly with its lights off. Karl Largie testified that he was standing outside his establishment near the site of the shooting and heard a "bang noise" and observed a car leaving the area with its lights off. Largie described the vehicle as a Chevrolet Caprice, dark in color with heavily tinted windows.

Petitioner contends that he was unaware of Howard's statement on a national news network, CNN, that she did not see the car and that this statement was exculpatory. The Court holds that this statement is not encompassed within the requirements of Brady as a statement made on a public news broadcast such as CNN is public knowledge and available to the defense.

Petitioner contends that the Commonwealth withheld exculpatory information because it did not disclose Largie's statement to

14

police that he believed the car to be brown or burgundy as this information could have impeached Largie's trial testimony. The Court holds that this information is not exculpatory. First, petitioner attributes the statement that the car was brown or burgundy made by an anonymous witness as having been made by Largie. Petitioner speculates that Largie and the anonymous witness were the same person. Furthermore, even if Largie had made the statement, it does not contradict Largie's testimony at trial. The record, including the trial transcript, demonstrates that Largie testified that it was dark outside and that the Chevrolet Caprice was dark in color. When asked what color the car was, Largie responded, "Well, it was very dark, and I assumed it be like –." Petitioner objected to any assumptions the witness would make and the objection was sustained. Thus, nothing in the record demonstrates what color Largie assumed the car to be.

Petitioner contends further that he was unaware of a statement made by Howard to Police Officer Antonio DuVall that she had urged Largie to talk to the police about the car, as she did not want to get involved because of her immigration status. Furthermore, petitioner contends he should have been provided with a letter from Detective Leadmon to the Immigration and Naturalization Service that Howard was considered a witness, whose testimony was crucial to the prosecution. Petitioner argues that this information would

15

have impeached Howard's testimony.  Petitioner next contends that statements of various witnesses that the sound of the gunshot appeared to come from near the victim, that the gunshot sounded like it came from a handgun, and that a puff of smoke was seen coming from a burgundy Nissan or Maxima, which sped away after the shooting, were all exculpatory as these statements would have impeached Howard's and Largie's testimony and the Commonwealth's theory that Charlot was shot from a gun fired from the Caprice.

The Court holds that this evidence is not favorable to petitioner.  Petitioner does not contend that Howard testified falsely in exchange for favorable treatment with the Immigration and Naturalization Service or that the letter written by Detective Leadmon influenced Howard's testimony.  Neither Howard nor Largie testified concerning the location of the shooter or the direction from which the sound of the gunshot came.  The testimony from both Howard and Largie was corroborated by evidence that proved Charlot was killed by a bullet fired from petitioner's Bushmaster rifle.

In another portion of claim (I), petitioner alleges the Commonwealth was required to, but did not, disclose the contents of witness statements in connection with the wounding of Muhammad Rashid in Prince George County, Maryland on September 15, 2002. Rashid testified at trial and identified Malvo as the person who shot him. Rashid testified further that he recognized the structure

16

of Malvo's face and that in his first statement he had described Malvo's color as not pure black or pure white. When questioned about his 911 telephone call and his description of the shooter as being 35 years old, Rashid testified that he had been misunderstood and that the assailant appeared to be between 25 and 30 years old.

Petitioner contends the Commonwealth should have disclosed a posting for a "Robbery Lookout" which described the shooter as a 35-year-old black male; Detective Darrell Disque's investigative summary indicating that Rashid had named James E. Donmore as a suspect; Detective Disque's hand written notes indicating Rashid had described the assailant as having cream colored skin and as being probably white; Rashid's statement that he did not think he would recognize his assailant; and Rashid's failure to pick Malvo from a photo line-up. Petitioner contends this information would have impeached Rashid's credibility.

The Court holds that this evidence is not exculpatory because it was not material. The evidence at trial proved that Rashid was shot with the .22 caliber gun that Malvo dropped while being chased in Montgomery, Alabama. Furthermore, as evidence connecting petitioner to numerous other shootings was abundant, petitioner cannot demonstrate that impeaching Rashid as to his identification of Malvo would undermine the confidence in the outcome of his trial.

17

Petitioner argues that all of the allegedly exculpatory evidence must be considered in its totality when determining the materiality of the evidence. Petitioner is correct that when considering materiality, we consider the suppressed evidence as a whole, not item by item. Workman v. Commonwealth, 272 Va. 633, 644-45, 636 S.E.2d 368, 375 (2006); Kyles v. Whitley, 514 U.S. 419, 436 (1995). However, we do not reach the issue of materiality unless we first determine that the evidence is favorable to the accused because it is exculpatory or because it may be used for impeachment. Workman, 272 Va. at 644-45, 636 S.E.2d at 374. We have already determined that, other than petitioner's allegations concerning the Rashid shooting, none of the suppressed evidence upon which petitioner relies constituted evidence favorable to petitioner. However, even if it were all favorable to petitioner, none of the suppressed evidence would have been material because, taken as a whole, it does not undermine confidence in the forensic evidence admitted at trial that tied petitioner to both the Bushmaster rifle used in many of the shootings, and the .22 caliber handgun Malvo dropped in Alabama, which was used in other shootings. Furthermore, petitioner does not challenge the evidence that proved he was involved in at least nine other shootings, including the murder of Dean Meyers. Thus, petitioner cannot establish that there is a reasonable probability that his knowledge

18

or use of the alleged exculpatory evidence would have undermined the confidence in the outcome of the trial.

In claim (II), petitioner alleges the trial court's decision to permit petitioner to represent himself at trial violated petitioner's right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States. Although petitioner uses the terminology associated with a claim alleging the denial of the "effective assistance of counsel" as defined in Strickland v. Washington, 466 U.S. 668, 686 (1984), the Court holds that this claim, in fact, involves petitioner's Sixth Amendment right to counsel and actions taken by the trial court as opposed to any act or omission of counsel.[2]

In a portion of claim (II), petitioner alleges the trial court violated his Sixth Amendment right to counsel when the court allowed him to represent himself without adequately warning him of its dangers. The record, including the petition for appeal filed with this Court on direct appeal of petitioner's capital convictions, demonstrates that petitioner argued only that the

_____

[2] In a portion of claim (II), petitioner attempts to incorporate, by reference, arguments related to his capacity to choose not to present evidence of his serious mental health illness during the penalty phase of his trial. The Court declines to consider "by reference" these arguments and holds that this claim, as it relates to actions taken by the trial court, is conclusional and, therefore, will not support the issuance of a writ of habeas corpus. Penn v. Smyth, 188 Va. 367, 370-71, 49 S.E.2d 600, 601

19

trial court erred because it had failed to adequately explain the limitations it was imposing on petitioner's access to "standby counsel."

To the extent petitioner is reiterating the arguments raised on direct appeal, the Court holds that this portion of claim (II) is barred because this issue was raised and decided in the trial court and on direct appeal from the criminal conviction and, therefore, it cannot be raised in a habeas corpus petition. Henry v. Warden, 265 Va. 246, 249, 576 S.E.2d 495, 496 (2003). To the extent petitioner is challenging any other aspect of the trial court's inquiry or warnings to petitioner, the Court holds this claim is procedurally defaulted because this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus. Slayton v. Parrigan, 215 Va. 27, 29, 205 S.E.2d 680, 682 (1974), cert. denied, 419 U.S. 1108 (1975).

In another portion of claim (II), petitioner alleges the trial court violated his Sixth Amendment right to counsel when the court allowed him to represent himself without assessing petitioner's competence to waive his right to counsel. The Court holds that this portion of claim (II) is procedurally defaulted because this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ

(1948). 20

of habeas corpus.  Id.

In another portion of claim (II), petitioner alleges the trial court violated his Sixth Amendment right to counsel because the court placed restrictions that were too burdensome on petitioner's use of standby counsel during that part of the trial.  The Court holds that this portion of claim (II) is barred because this issue was raised and decided in the trial court and on direct appeal from the criminal conviction and, therefore, it cannot be raised in a habeas corpus petition. Henry, 265 Va. at 249, 576 S.E.2d at 496.

In a portion of claim (III)(A), petitioner alleges he was denied the right to the effective assistance of trial counsel because information regarding petitioner's mental condition was not presented to the trial court when petitioner sought to represent himself.

The Court holds that this portion of claim (III)(A) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland, 466 U.S. at 687.  The record, including the trial transcript, demonstrates that there was no indication that petitioner suffered from any mental illness as petitioner answered the court's questions and insisted that he understood the risks and conditions associated with representing himself at trial.  Petitioner fails to point to expert evidence, available at that time, upon which counsel could have relied and

21

which would have established that petitioner's ability to make decisions and understand the proceedings was impaired. The trial transcript demonstrates that counsel found petitioner to be "a very bright man" and petitioner has failed to proffer any evidence to the contrary. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (III)(A), petitioner alleges he was denied the right to the effective assistance of trial counsel because information regarding petitioner's mental condition was never presented to the jury during the penalty phase of his trial. Petitioner claims that counsel was "well aware" of his "severe mental illness and his bizarre behavior" but never investigated or presented this information to the jury. Petitioner claims that, had this evidence been presented, he would not have been sentenced to death.

The Court holds that this portion of claim (III)(A) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the trial transcript, demonstrates that petitioner refused to cooperate with the Commonwealth's mental health expert and understood that his refusal would result in the trial court barring him from presenting

22

mental health experts to testify at the penalty phase of the trial. Additionally, despite counsel's inability to present expert testimony as to petitioner's mental health, counsel did present lay testimony from petitioner's friends regarding changes in his personality and demeanor prior to the shootings. Furthermore, petitioner has failed to proffer the records from the mental health exams to which he subjected himself and, therefore, has failed to demonstrate that the mental health evidence available at the time of trial would have aided in his defense. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (III)(A), petitioner alleges he was denied the right to the effective assistance of trial counsel because counsel failed to advise petitioner about the consequences he faced by refusing to cooperate with the Commonwealth's expert mental health witness.

The Court holds that this portion of claim (III)(A) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the trial transcript, demonstrates that any alleged inadequacy in counsel's advice was cured when the trial court informed petitioner of the

23

consequences he faced by refusing to cooperate with the Commonwealth's mental health expert. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (III)(A), petitioner alleges he was denied the right to the effective assistance of trial counsel because counsel failed to object when the trial court prevented all evidence of mental illness from being presented at trial even though the court did not inquire into the effect the evidence might have on the jury.

The Court holds that this portion of claim (III)(A) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. Petitioner has failed to state on what grounds trial counsel should have objected to the trial court's ruling, which was properly within its discretion pursuant to Code § 19.2-264.3:1(F)(2), as a result of petitioner's decision to refuse to cooperate with the Commonwealth mental health expert. See Muhammad, 269 Va. at 508, 619 S.E.2d at 48. Additionally, while the trial court did not permit expert testimony, counsel did present lay testimony from petitioner's friends at sentencing regarding changes in his personality and demeanor. Thus, petitioner has failed to demonstrate that counsel's performance was

24

deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (III)(A), petitioner alleges he was denied the right to the effective assistance of trial counsel because counsel failed to argue that recent opinions from the United States Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005) (defendants under the age of eighteen not eligible for the death sentence) and Atkins v. Virginia, 536 U.S. 304 (2002) (defendants who are mentally retarded not eligible for the death sentence) and evolving standards of decency require that a person suffering from a mental illness should not be sentenced to death.

The Court holds that this portion of claim (III)(A) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. Petitioner does not articulate a factual basis to support this claim, as he has not demonstrated that he was, in fact, mentally ill at the time of the murders or at trial. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (III)(A), petitioner alleges the trial court erred in allowing petitioner to represent himself and

25

by denying petitioner's use of his mental health expert at trial. The Court holds that this claim is barred because these issues were raised and decided in the trial court and on direct appeal from the criminal conviction and, therefore, they cannot be raised in a habeas corpus petition. Henry, 265 Va. at 249, 576 S.E.2d at 496.

In claim (III)(B), petitioner alleges that, after he acquiesced to representation by counsel, he was denied the effective assistance of trial counsel because counsel failed to object to improper arguments by the prosecution during the penalty phase of the trial. During closing argument in the penalty phase, the Commonwealth commented that the "original" Muhammad that people knew years ago "no longer exists," was "dead," and had been "murdered" by the man that was on trial. Petitioner claims that these remarks were improper and should have been objected to as the remarks effectively told the jury not to consider the mitigation evidence that had been presented and it minimized the importance of the jury's decision regarding sentencing.

The Court holds that claim (III)(B) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the trial transcript, demonstrates that the jury was presented with mitigation evidence from various witnesses who knew petitioner in both a personal and professional capacity and who interacted with

26

petitioner and his family.  Witnesses described changes in the petitioner's personality and demeanor that caused petitioner to become someone that the witnesses no longer knew.  The Commonwealth's remarks, therefore, were based on this testimony.  Additionally, the jury was instructed that its sentence was to be based upon all of the evidence, "including evidence in mitigation."  It is presumed that a jury will follow the instructions given by the trial court.  Green v. Young, 264 Va. 604, 611, 571 S.E.2d 135, 139 (2002).  Petitioner has failed to articulate any factual basis upon which the Court could conclude that the jury did not follow the court's instructions.  Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In claim (III)(C), petitioner alleges he was denied the effective assistance of trial counsel because counsel failed to consult with or request expert assistance on subjects upon which the Commonwealth relied upon expert testimony.

The Court holds that claim (III)(C) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland.  Petitioner has failed to proffer the names of any experts he contends counsel should have consulted and fails to proffer any expert affidavits to demonstrate what

27

information these experts could have provided at trial.  Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In claim (III)(D), petitioner alleges he was denied the effective assistance of counsel because trial and appellate counsel failed to allege and preserve the claims made under claims (I), (II), (IV) and all subparagraphs.

The Court holds that claim (III)(D) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland.  Petitioner does not articulate a factual basis to support this claim and does not identify with specificity any act or omission of counsel which was objectively unreasonable. Furthermore, petitioner does not attempt to demonstrate how these failures were prejudicial.[3]  Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In claim (III)(E), petitioner alleges he was denied the effective assistance of trial and appellate counsel because counsel failed to allege and preserve the errors assigned in his direct

_____

[3] There is no claim (IV) in the petition for a writ of habeas corpus.

28

appeal of his convictions to the Supreme Court of Virginia. Petitioner contends that, to the extent this Court holds any of the claims found in sections (I), (II) or (IV)[4] could have been raised at trial or on direct appeal, counsel's failure to raise and preserve the issues constitutes ineffective assistance of counsel.

The Court holds that claim (III)(E) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. Petitioner does not articulate a factual basis to support this claim and, therefore, cannot demonstrate that any omission of counsel was objectively unreasonable. Furthermore, petitioner does not attempt to demonstrate how these failures were prejudicial. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In a portion of claim (III)(F), petitioner alleges he was denied the effective assistance of trial counsel as counsel allegedly failed to adequately protect petitioner's rights to due process and an impartial jury because "the indictment, jury instructions and verdict forms did not require the jury to agree that the elements of capital murder under Virginia Code §§ 18.2-31(8), (13) and 18.2-46.4 were proven beyond a reasonable doubt in

_____

[4] As noted previously, there is no claim (IV) in the petition for a writ of habeas corpus.

29

order to find [Petitioner] guilty." Petitioner contends the indictments, jury instructions, and verdict forms were inadequate because they did not specify which other person petitioner had killed within a three-year period or which act of terrorism petitioner had committed.

The Court holds that this portion of claim (III)(F) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. Regarding the charge and conviction under Code § 18.2-31(8), there is no requirement that the indictment, jury instructions, or verdict forms specify which other killing is being included within the three year period. The Commonwealth only needs to prove that the defendant was a principal in the first degree in the capital murder charged in the indictment and at least an accomplice in any other killing within a three-year period. Burlile v. Commonwealth, 261 Va. 501, 510-11, 544 S.E.2d 360, 365-66 (2001); Code § 18.2-31(8). Here, the evidence was sufficient to show petitioner's involvement at least as an accomplice in multiple other killings.

With regard to the charge and conviction of capital murder based upon the terrorism predicate in Code §§ 18.2-31(13) and 18.2-46.4, we previously rejected on direct appeal petitioner's argument that the indictment must specify the intent of the petitioner under the two separate subsections of § 18.2-46.4. Muhammad, 269 Va. at

494-95, 619 S.E.2d at 40-41.  Petitioner proffers no other valid arguments he contends counsel should have made.  As such, petitioner cannot meet his burden to prove that counsel failed to adequately preserve petitioner's rights and that he was prejudiced as a result.

On direct appeal of petitioner's convictions for the capital murder of Dean Meyers in the commission of an act of terrorism, we held that an act of terrorism is proven either by showing that petitioner intended to "(i) intimidate the civilian population at large; *or* (ii) influence the conduct or activities of the government of the United States, a state or locality through intimidation" or both.  Muhammad, 269 Va. at 494, 619 S.E.2d at 40. The record, including the trial transcript, demonstrates that the jury was instructed, "An act of terrorism is any murder committed with the intent to intimidate the civilian population at large or to influence the conduct or activities of the government of the United States, a state or locality through intimidation." As to petitioner's claim that counsel should have argued that the jury instructions and verdict forms must specify which act of terrorism petitioner intended to commit at the time of the killing, petitioner has failed to demonstrate that the specific acts of terrorism constitute separate elements of the offense rather than the means by which an act of terrorism is accomplished.  The

31

elements the jury was required to find unanimously in order to convict petitioner of capital murder were the killing of Dean Meyers and that the killing occurred during the commission of an act of terrorism. Intimidating the civilian population and influencing the conduct of government constitute "possible sets of underlying brute facts [that] make up [the] particular element," of having committed an act of terrorism. See Richardson v. United States, 526 U.S. at 813, 817 (1999). Petitioner has failed to demonstrate that counsel's performance was deficient.

Furthermore, as the record demonstrates that the evidence overwhelmingly proved both sets of facts which can comprise an act of terrorism, petitioner has failed to demonstrate that there is a reasonable probability that, had counsel asked for such specification in the jury instructions or verdict form, the result of the proceeding would have been different.

In another portion of claim (III)(F), petitioner alleges he was denied the effective assistance of counsel because counsel failed to "require" that the indictments include the aggravating factors that had to be proven in order to make petitioner eligible for the death penalty.

The Court finds that this claim is without merit. The record, including the trial transcripts and this Court's opinion on direct appeal, demonstrates that counsel filed a motion to dismiss and

32

properly preserved this issue, which was addressed on direct appeal as this Court found that "aggravating factors are not constitutionally required to be recited in a capital murder indictment." Muhammad, 269 Va. at 494, 619 S.E.2d at 40.

In another portion of claim (III)(F), petitioner alleges he was denied the effective assistance of counsel because counsel failed to "argue the Court's improper application of harmless error." Presumably, this contention refers to the direct appeal of petitioner's convictions.

The Court holds that this portion of claim (III)(F) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. Petitioner does not articulate a factual basis in support of this claim, fails to identify with specificity how this Court's application of harmless error occurred, and fails to state how or on what ground counsel could have objected to this Court's application of harmless error. Therefore, petitioner cannot demonstrate that any omission of counsel was objectively unreasonable. Furthermore, petitioner does not attempt to demonstrate how this failure was prejudicial. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

33

In another portion of claim (III)(F), petitioner alleges that the various verdict forms did not comply with Code § 19.2-264.4(D). The Court holds that this portion of claim (III)(F) is procedurally defaulted as this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus.  Slayton, 215 Va. at 29, 205 S.E.2d at 682.

Accordingly, the petition is dismissed.

This order shall be published in the Virginia Reports.

A Copy,

Teste:

Patricia L. Harrington, Clerk