PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOHN ALLEN MUHAMMAD,

*Petitioner-Appellant,*

v.

LORETTA K. KELLY, Warden,
Sussex I State Prison,

*Respondent-Appellee.*

No. 08-13

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:07-cv-01022-LO-TRJ)

Argued: May 12, 2009

Decided: August 7, 2009

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge Duncan joined.

## COUNSEL

**ARGUED:** Jonathan P. Sheldon, DEVINE, CONNELL & SHELDON, PLC, Fairfax, Virginia, for Appellant. Katherine Baldwin Burnett, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON**

**BRIEF:** James G. Connell, III, DEVINE, CONNELL & SHELDON, PLC, Fairfax, Virginia; Nathaniel H. Akerman, Joseph Perkovich, DORSEY & WHITNEY LLP, New York, New York, for Appellant. William C. Mims, Attorney General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

## OPINION

GREGORY, Circuit Judge:

John Allen Muhammad petitions this Court for a writ of habeas corpus. He alleges nondisclosure of exculpatory information by the prosecution, ineffective assistance of his trial counsel, improper exclusion of expert testimony during his sentencing phase, and improper time and page restrictions on his habeas petition in the district court below. We are unable to find reversible error in the conclusions of the state and district courts, and we therefore affirm the district court's decision to deny habeas relief.

I.

Paul J. LaRuffa was a restaurateur in Clinton, Maryland. At the end of the day on September 5, 2002, LaRuffa closed his restaurant and proceeded to take his laptop computer and $3500 in cash and credit receipts to his car. After he sat behind the steering wheel, he saw a figure to his left and a flash of light, then heard gunshots. LaRuffa was shot six times, but survived. An employee who left the restaurant with LaRuffa witnessed the shooting and called 911. He testified that he saw a "kid" run up to LaRuffa's car, fire into it, and take the briefcase and laptop. *Muhammad v. Virginia*, 619 S.E.2d 16, 25 (Va. 2005). The briefcase and empty deposit bags were found six weeks later in a wooded area approxi-

mately a mile from the shooting. The DNA from clothing found nearby was consistent with that of Lee Boyd Malvo.

On September 15, 2002, there was a second shooting in Clinton, Maryland: Muhammad Rashid was locking the front door of the Three Roads Liquor Store from the outside when he heard gunshots behind him. A young man then rushed him and shot him in the stomach. Rashid testified that the young man was Malvo.

Almost a week later, on September 21, 2002, Claudine Parker and Kelly Adams were shot after closing the Zelda Road ABC Liquor Store in Montgomery, Alabama. Parker died as a result of her gunshot wound through the back—the bullet transected her spinal cord and passed through her lung. Adams was shot through the neck, and the bullet exited through her chin, breaking her jaw in half, shattering her face and teeth, paralyzing her left vocal cord, and severing nerves in her left shoulder. Yet, she survived. Bullets recovered from the shooting were eventually identified as coming from a Bushmaster high-powered rifle. While the rifle was being fired, Malvo was seen approaching Parker and Adams. A police car passed by the scene immediately after the shooting, and the officers observed Malvo going through the women's purses. The officers gave chase, but Malvo escaped. In the process, however, he dropped a gun catalog. Malvo's fingerprints were found on the catalog, and a .22-caliber, stainless-steel revolver was found in the stairwell of an apartment building that Malvo traversed. The revolver was the same as the one used to shoot LaRuffa and Rashid.

Two days later, on September 23, 2002, the manager of a Baton Rouge, Louisiana, Beauty Depot store, Hong Im Ballenger, was walking to her car after closing the store for the evening when she was shot once in the head. The bullet entered the back of her head and exited through her jawbone. She died as a result of the wound. The bullet was determined to have come from the Bushmaster rifle found on Muhammad

during his arrest. Witnesses saw Malvo flee from the scene with Ballenger's purse.

The sixth and seventh shootings occurred in Silver Spring, Maryland, on October 3, 2002. At approximately 8:15 a.m., Premkumar A. Walekar was shot while fueling his taxicab. The bullet went through his left arm and entered his chest, where it fatally damaged his heart. At approximately 8:30 a.m., Sarah Ramos was killed while sitting on a bench in front of the Crisp & Juicy Restaurant in the Leisure World Shopping Center. The bullet entered through the front of her head and exited through her spinal cord at the top of the neck. Both bullets were identified as having come from a Bushmaster rifle, and an eyewitness identified Muhammad's Chevrolet Caprice at the scene of the second shooting.

On October 3, 2002, at approximately 10:00 a.m., Lori Lewis-Rivera was shot in the back while vacuuming her car at a Shell gas station in Kensington, Maryland. The bullet was identified as coming from a Bushmaster rifle. An eyewitness said that he saw a Chevrolet Caprice in the area approximately twenty minutes before the shooting. At approximately 7:00 p.m., a police officer stopped Muhammad for running two stop signs. The officer gave Muhammad a verbal warning and released him. Later that night, at approximately 9:15 p.m., Pascal Charlot was shot in the chest as he crossed the intersection of Georgia Avenue and Kalmia Road in the District of Columbia. Charlot's shooting happened about thirty blocks from where Muhammad was stopped. The bullet fragments from both the Lewis-Rivera and the Charlot shootings were identified as coming from a Bushmaster rifle.

The next day, October 4, 2002, Caroline Seawell was putting bags in her minivan outside of a Michael's craft store in Fredericksburg, Virginia, when she was shot once in the back. The bullet damaged her liver and exited through her right breast, but she survived the attack. An eyewitness testified to seeing a Caprice in the parking lot at the time of the shooting,

and ballistics tests determined the bullet fragments came from a Bushmaster rifle.

On October 6, 2002, Tanya Brown was taking Iran Brown to Tasker Middle School in Bowie, Maryland. As Iran was walking on the sidewalk to the school, he was shot once in the chest. Tanya drove Iran to a health care center where surgeons were able to save his life despite lung damage, a large hole in his diaphragm, damage to the left lobe of his liver, and lacerations to his stomach, pancreas, and spleen. Two eyewitnesses testified that they saw a Caprice in the vicinity of the school the day before and the morning of the shooting. One eyewitness positively identified both Muhammad and Malvo in the Caprice the morning of the shooting. The police searched the surrounding area and found a ballpoint pen and a shell casing in the woods near the school. The area had been pressed down like a blind used to conceal hunters. The tissue samples from the pen matched Muhammad's DNA, and the shell casing and bullet fragments were determined to have come from a Bushmaster rifle. The Brown shooting was also the first time that police discovered communications from the shooters. The tarot card for death was found, and on it was written, "Call me God." On the back, someone had written, "For you, Mr. Police. Code: Call me God. Do not release to the Press." *Muhammad v. Virginia*, 619 S.E.2d at 27.

Three days later, on October 9, 2002, Dean Meyers was fueling his car at a Sunoco station in Manassas, Virginia, when he was shot in the head by a single bullet. The bullet was later determined to have come from a Bushmaster rifle. An eyewitness testified that she saw Muhammad and Malvo in the area approximately one hour prior. The police actually interviewed Muhammad in a parking lot across the street immediately after the shooting, and they later found a map with Muhammad's fingerprints in the parking lot.

On October 11, 2002, Kenneth Bridges was fired upon at an Exxon gas station in Massaponax, Virginia. He was shot

once in the chest by a bullet identified as having come from the Bushmaster rifle. Two eyewitnesses testified that they saw a Caprice at or near the Exxon that morning.

The fourteenth shooting occurred on October 14, 2002, in Falls Church, Virginia. Linda Franklin and her husband were loading their car outside of a Home Depot when she was shot in the head by a single bullet and killed. Ballistics experts determined that the bullet was from a Bushmaster rifle.

The next day, October 15, a Rockville, Maryland, dispatcher received the following telephone call: "Don't say anything, just listen, we're the people who are causing the killings in your area. Look on the tarot card, it says, 'call me God, do not release to press.' We've called you three times before trying to set up negotiations. We've gotten no response. People have died." *Id.* at 28. The caller hung up before the dispatcher could transfer the call to the Sniper Task Force.

Three days later, on October 18, Officer Derek Baliles of the Montgomery County, Maryland, Police received a telephone call. The caller told Baliles to "shut up" and said that he knew who was doing the shootings, but wanted the police to verify some information before he said anything further. *Id.* The caller asked questions about the Parker and Adams shootings in Alabama and hung up again. When the caller called again, Baliles verified the shootings. The caller stated that he needed to find more coins and a telephone without surveillance, then hung up. The same day, William Sullivan, a priest in Ashland, Virginia, received a telephone call from two people. The first male voice told him that someone else wanted to speak to him. The second male voice said that "the lady didn't have to die," and "it was at the Home Depot." *Id.* The caller then told him about the shooting in Alabama and said, "Mr. Policeman, I am God. Do not tell the press." *Id.* The caller concluded by telling Sullivan to relay the information to the police.

The next day, October 19, 2002, Jeffery Hopper and his wife were leaving a restaurant in Ashland, Virginia, when he was shot in the abdomen. Hopper survived, but his injuries required five surgeries to repair his pancreas, stomach, kidneys, liver, diaphragm, and intestines. In the woods near the crime scene, police discovered another blind similar to the one at the Brown shooting. They also found a shell casing, a candy wrapper, and a plastic sandwich bag that was attached with a thumbtack to a tree at eye level and was decorated with Halloween characters and self-adhesive stars. The shell casing and bullets were determined to have come from a Bushmaster rifle. The candy wrapper contained Muhammad's and Malvo's DNA. The sandwich bag contained a handwritten message:

> For you Mr. Police. "Call me God." Do not release to the Press.
>
> We have tried to contact you to start negotiation . . . These people took our call for a Hoax or Joke, so your failure to respond has cost you five lives.
>
> If stopping the killing is more important than catching us now, then you will accept our demand which are non-negotiable.
>
> (i) You will place ten million dollar in Bank of america account . . . We will have unlimited withdrawl at any atm worldwide. You will activate the bank account, credit card, and pin number. We will contact you at Ponderosa Buffet, Ashland, Virginia, tel. # . . . 6:00 am Sunday Morning. You have until 9:00 a.m. Monday morning to complete transaction. "Try to catch us withdrawing at least you will have less body bags."
>
> (ii) If trying to catch us now more important then prepare you body bags.

If we give you our word that is what takes place.

"Word is Bond."

P.S. Your children are not safe anywhere at anytime.

*Id.* at 28-29 (alterations in original). However, the note was not discovered until after the deadline had passed. Surveillance videotapes from that day identified Muhammad at a Big Lots store near the shooting.

The day after Hopper was shot, the FBI Sniper Tip Line received a call from a male who stated, "Don't talk. Just listen. Call me God. I left a message for you at the Ponderosa. I am trying to reach you at the Ponderosa. Be there to take a call in ten minutes." *Id.* at 29. On October 21, 2002, the FBI negotiations team received a call that had been re-routed from the Ponderosa telephone number. A recorded voice said:

Don't say anything. Just listen. Dearest police, Call me God. Do not release to the press. Five red stars. You have our terms. They are non-negotiable. If you choose Option 1, you will hold a press conference stating to the media that you believe you have caught the sniper like a duck in a noose. Repeat every word exactly as you heard it. If you choose Option 2, be sure to remember we will not deviate. P.S. – Your children are not safe.

*Id.*

The next day at around 6:00 a.m., Conrad Johnson, a bus driver for the Montgomery County Transit Authority, was shot in the chest as he was entering his bus in Aspen Hill, Maryland. Johnson was conscious when the rescue workers arrived, but died at the hospital. The bullet fragments were determined to have come from a Bushmaster rifle. At another blind discovered nearby, a black duffle bag and a brown left-

handed glove were found. DNA from hair found in the duffle bag matched that of Muhammad. Another plastic bag that contained self-adhesive stars and a note was left behind.

On October 24, 2002, the FBI captured Muhammad and Malvo at a rest area in Frederick County, Maryland. They were asleep in a Caprice, where police found a loaded .223-caliber Bushmaster rifle behind the rear seat. The DNA on the rifle matched that of both Muhammad and Malvo, although the only fingerprints found on the rifle were those of Malvo. The Caprice had been modified with heavy window tint, a hinged rear seat that provided easy access to the trunk from the passenger compartment, and a hole that had been cut into the trunk lid just above the license plate. Covering the hole was a right-handed brown glove that matched the left-handed glove found near the Johnson shooting, and a rubber seal crossed over the hole. Moreover, the trunk had been spray-painted blue.

Police also found the following items in the Caprice: a global positioning system receiver; a magazine about rifles; an AT&T telephone charge card; ear plugs; maps; plastic sandwich bags; a rifle scope; .223-caliber ammunition; two-way radios; a digital voice recorder; a receipt from a Baton Rouge, Louisiana, grocery store, dated September 27, 2002; an electronic organizer; a plastic bag from Big Lots; a slip of paper containing the Sniper Task Force telephone number; and a list of schools in the Baltimore area. Moreover, police found LaRuffa's laptop computer, onto which Muhammad had loaded "Microsoft Streets and Trips 2002" on September 2, 2002. In the software program, maps had been marked with icons, including some with a skull and crossbones. Icons indicated where Walekar, Lewis-Rivera, Seawell, Brown, Meyers, and Franklin had been shot. There was also a document entitled "Allah8.rtf" that contained portions of the text communicated to police in the extortion demands.

In total, Muhammad was accused of shooting sixteen people and killing ten of them. Muhammad was convicted by a

jury in the Circuit Court of Prince William County, Virginia, on November 17, 2003, for the 2002 capital murder of Dean Meyers as more than one murder in three years, in violation of Va. Code Ann. § 18.2-31(8) (2003); for the capital murder of Meyers in the commission of an act of terrorism, in violation of Va. Code Ann. § 18.2-31(13) (2003); for conspiracy to commit capital murder; and for the illegal use of a firearm during the commission of murder. On November 24, 2003, the jury sentenced Muhammad to death for the capital murder and to twenty-three years in prison for the other crimes. The trial court entered final judgment in accordance with the verdict on March 29, 2004. The Supreme Court of Virginia upheld Muhammad's convictions on April 22, 2005, *Muhammad v. Virginia*, 619 S.E.2d 16, and denied rehearing on September 23, 2005. The Supreme Court of the United States denied Muhammad's petition for a writ of certiorari on May 15, 2006. *Muhammad v. Virginia*, 547 U.S. 1136 (2006).

The Prince William County Circuit Court appointed counsel to represent Muhammad on habeas corpus review. Muhammad filed his petition on July 31, 2006, and the Supreme Court of Virginia dismissed the petition on June 12, 2007, *Muhammad v. Warden*, 646 S.E.2d 182 (Va. 2007). It denied rehearing on September 25, 2007. The Supreme Court of the United States denied Muhammad's petition for a writ of certiorari on April 14, 2008. *Muhammad v. Kelly*, 128 S. Ct. 1889 (2008). On October 4, 2007, the Prince William County Circuit Court set Muhammad's execution date for November 5, 2007. On October 10, 2007, a group of attorneys requested that the U.S. District Court for the Eastern District of Virginia appoint them to represent Muhammad and stay his execution pursuant to 28 U.S.C. § 2251 (2006) so that they could file a petition under 28 U.S.C. § 2254 (2006). The district court granted their request on October 26, 2007, and directed them to file, within sixty days, a petition of not more than fifty pages. They subsequently filed a motion requesting that the district court rescind its briefing order and allow them to wait a year to file Muhammad's § 2254 petition. The dis-

trict court denied the motion, but allowed the attorneys an additional thirty days to file an eighty-page petition. On January 22, 2008, the district court allowed Muhammad to file a placeholder petition on the ninetieth day from the stay and gave advance permission to file an amended petition three months afterward. On January 24, 2008, Muhammad filed his placeholder petition, and on April 23, 2008, he filed his amended petition.

On April 23, 2008, Muhammad also filed a motion requesting funding for a neuropsychologist, a neuropsychiatrist, and brain imaging in the amount of $29,000. Additionally, Muhammad filed a motion for leave to file a third habeas petition, arguing that his one-year time limit had not expired. On August 6, 2008, the district court denied Muhammad's motion to file a third amended petition. On September 24, 2008, the district court denied his motion for funding and granted the Warden's motion to dismiss the petition and to lift the stay of execution. Muhammad requested a certificate of appealability (COA) on October 20, 2008, and filed a notice of appeal. The district court denied a COA. On January 30, 2009, Muhammad filed a motion with this Court seeking a COA, and we granted his motion on February 10, 2009.

II.

The district court's denial of a petition for a writ of habeas corpus is reviewed de novo. *Bell v. Ozmint*, 332 F.3d 229, 233 (4th Cir. 2003). We may grant relief on a claim adjudicated on the merits in a state court only if the state-court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). With this in mind, we turn to the merits of Muhammad's claims.

III.

A.

Muhammad's first argument is that the government with-held exculpatory information during his trial. "[A] *Brady* [*v. Maryland*, 373 U.S. 83 (1963),] violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial." *Monroe v. Angelone*, 323 F.3d 286, 299-300 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Muhammad notes that in June 2006, one month before the due date for filing his state habeas petition, his Virginia attorneys received from his Maryland attorneys a DVD with approximately 30,000 pages of discovery responses that were not produced during his Virginia case over two years earlier even though they were possessed by the same multijurisdictional joint investigation team. Muhammad contends that several of these undisclosed documents contained exculpatory information that would have undermined portions of the prosecution's case in Virginia.

First, Muhammad takes issue with the government's failure to disclose an FBI criminal analysis that indicated that the sniper committing the shootings was likely acting alone. He believes that this analysis would have undermined the testimony of sniper expert Mark Spicer, who opined that a sniper team carried out the shootings because one person could not have done so alone. Moreover, in the murder of Pascal Charlot, the government had no direct evidence of Muhammad's involvement, but used Spicer's testimony to draw the connection. The district and state courts concluded that the analysis was not exculpatory because the report did not definitively conclude that the killings were the work of a single shooter.

*Muhammad v. Warden*, 646 S.E.2d at 186-87. For example, the report opined that "[i]f there is a second offender, he is not likely to be an equal partner in these crimes, and would be subservient to the primary offender." (J.A. 2019.) Furthermore, the FBI profile explicitly notes, "This analysis is not a substitute for a thorough, well-planned investigation, and should not be considered all inclusive. The information provided is based upon probabilities." (*Id.* at 2016.) Given the inconclusive language in the report, it cannot be considered exculpatory, and the state court's conclusion that there was no *Brady* violation was not in error.

Second, Muhammad takes issue with the ballistics evidence used to convict him. Among the undisclosed information, he points to reports that the evidence recovered from the September 5 and September 14 shootings were too damaged to provide a conclusive ballistics match. (J.A. 2536.) He also highlights a report from the Prince George's County Police Department that there was insufficient evidence to determine whether the handgun recovered at the Alabama shooting was that used to fire the bullets that killed the victims. (J.A. 2537.) Finally, he points to a December 3, 2002, report that preliminary ballistics findings were inconclusive. (J.A. 2539-40.) The district court dismissed the claims after it determined that Muhammad failed to present them to the state court. Muhammad concedes that he did not present the claims to the state court initially (Pet'r's Br. 9-10), but he responds that the Warden raised the issue by arguing that the suppressed evidence was not material and that he disputed the claim.

Upon review of the portions of the record that Muhammad cites in support of his argument that these claims were properly presented to the state court, we must rule against him. There is no indication in the record that the government directly presented the issue of the materiality of the undisclosed ballistics evidence to the court. And although Muhammad claims to have disputed the prosecution's ballistics testimony in his motion for rehearing, the motion does not

mention the ballistics reports detailed above. Thus, it appears that Muhammad did not present these claims to the state court and they are therefore forfeited.[1]

Third, Muhammad disputes evidence of his involvement in the Parker shooting in Alabama, which was used as one of the predicate killings for his capital charges. He claims that several witnesses reported conflicting information, and relevant to the undisclosed information, two witnesses who identified someone other than Malvo at the scene were not disclosed to him, and witnesses who reported seeing a handgun were also not disclosed. Muhammad interprets the previously undisclosed interviews to indicate that Clyde Wilson—who, along with James Gray, chased after Malvo—saw Malvo point and fire a handgun. Yet, Wilson does not actually say that he saw a handgun; in fact, he could not specifically identify the type of gun that he saw, but demonstrated what he saw by extending his arms straight out. (J.A. 2512.) Additionally, Muhammad argues that Wilson's account could have been used to impeach other witnesses because Wilson stated that the suspect was wearing a green or turquoise shirt—different from other descriptions given—and he could not identify Malvo in the lineup, casting doubt on Gray's identification. The Supreme Court of Virginia determined that his testimony could not have been used to impeach Gray because Wilson saw Malvo from a different vantage point and chased Malvo down a different route from Gray, and Gray saw Malvo face-to-face. Moreover, because Wilson did not testify, the report would have been of minimal use. We cannot say that the Supreme Court of Virginia's conclusion was unreasonable.

Further, in an undisclosed report, forensics experts in Alabama had previously determined that the bullets used in the killing were .22 caliber and likely came from a handgun.

---

[1]We note that even if Muhammad had presented these claims, there was other, conclusive ballistics evidence to support his convictions. Therefore, the challenged ballistics evidence would not have been exculpatory.

Muhammad contends that it was only after his apprehension that the experts determined, without examining the weapon, that the bullets came from his .223-caliber Bushmaster rifle and not the .22-caliber handgun found nearby. But Muhammad's challenges to the ballistics information were not made in state court. Moreover, ATF firearms examiner Dandridge made an independent conclusive match of the bullets found in Montgomery to the Bushmaster rifle. (J.A. 713-15.) Thus, these claims must fail.[2]

Fourth, Muhammad challenges additional evidence related to the Charlot shooting in the District of Columbia, another predicate killing for his capital murder conviction. He alleges that the government suppressed evidence that one witness, Gail Howard, had previously provided only a vague description of the car seen at the scene; did not speak to the police until weeks after the shooting, contrary to her testimony; and had letters written by the D.C. police to the Immigration and Naturalization Service on her behalf in order to assuage her fears about her immigration status. Moreover, those witnesses who talked to the police within hours after the shooting supposedly indicated that a handgun, not a rifle, was used in the shooting.

Howard's police statement said that the car she saw was an "American made, big police looking car, square shape. The same type of car people buys [sic], after the police had them. I think it was a four door and the windows were tinted. And the car was dark colored." (J.A. 2054B.) This description is not vague; it accurately describes a 1990s-model Chevrolet Caprice, which is what Muhammad drove. As for the immigration letters, as the Supreme Court of Virginia noted, Muhammad makes no allegation that Howard testified falsely, so it is unclear how this information would prove exculpatory.

---

[2]Muhammad makes an additional argument that the statement of one Officer D.L. Johnson, given within days of the shooting, was not disclosed to him, but this argument also was not made in state court.

Regarding the statements from the other seven witnesses, only one of them, Ayman Gomma, states that a handgun was fired, and this was not from personal observation, but was instead a deduction he drew from his training in the Army and the sound that he heard. Moreover, none of them testified at trial, and Howard's testimony, which the witnesses would have supposedly impeached, was corroborated by the ballistics evidence. Thus, the Supreme Court of Virginia's conclusion that the information was not exculpatory was not incorrect.

The fifth category of evidence that Muhammad raises as exculpatory concerns the Ballenger killing in Baton Rouge, Louisiana, which was used as one of the predicate offenses for the Virginia capital charges. Ingrid Shaw testified that she saw Malvo running from the murder scene and identified Muhammad's Caprice as the one that Malvo entered. However, when she was first interviewed, and in two subsequent interviews, she did not mention seeing a car parked nearby that later picked up Malvo. When she did mention a car, she said it could be an "Olds Cutlass," and the Louisiana license plate number she gave was registered to a 1979 Ford LTD. (J.A. 2496.) Presumably, this information could have been used to impeach her testimony, and the district court found as much. However, the district court ultimately concluded that the information was not prejudicial because of the ballistics evidence, her positive identification of Malvo, and the fact that the Ballenger murder was one of several predicate killings for the capital murder charge. We can find no error in this conclusion.

Finally, Muhammad contends that the Commonwealth failed to disclose a series of twelve letters written by Malvo to another inmate named "Pac-Man." These letters allegedly contradict the Commonwealth's position that Muhammad directed or controlled Malvo's acts, as required by Virginia law in order to subject Muhammad to the death penalty. *See Muhammad v. Virginia*, 611 S.E.2d 537, 553-56 (Va. 2005). While the letters do not discuss Muhammad directly, (J.A.

1534-43) Muhammad argues that the letters could be used to demonstrate that Malvo was not malleable and could think independently of Muhammad. The district court and the Supreme Court of Virginia determined that the letters were largely cumulative because there was trial testimony that also indicated that Malvo could think independently. Given this, the conclusion of the state courts in this regard was not unreasonable.

Let it be clear that we by no means condone the actions of the Commonwealth in this case. As a matter of practice, the prosecution should err on the side of disclosure, especially when a defendant is facing the specter of execution. When questioned at oral argument regarding why this information was withheld or why the Commonwealth did not take the step of instituting an open-file policy, the Commonwealth had no explanation. Yet, at this stage of the criminal process, we deal only with actions that were clear violations of the Constitution. While not admirable, the Commonwealth's actions did not violate the Constitution. Even if the withheld evidence were exculpatory, Muhammad cannot show that he was prejudiced by any nondisclosure. The jury determined that he murdered several people, the evidence against him in most instances was compelling, and any number of the killings could serve as the one predicate killing necessary for his conviction. *See Griffin v. United States*, 502 U.S. 46, 49 (1991) ("[A] general jury verdict [is] valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action."). Thus, we find no constitutional violation.

B.

Muhammad's next set of claims involves his belief that his trial attorneys were ineffective because they did not object to his representing himself despite evidence that indicated brain abnormalities and difficulties processing and communicating

information. In order to establish a claim of ineffective assistance of counsel, Muhammad must first "show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, Muhammad must demonstrate that "the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

Muhammad alleges that his trial attorneys were informed of three abnormalities in an MRI taken prior to his October 20, 2003, request to represent himself: a) a shrunken cortex, b) a cavum septum pellucidum, and c) an abnormal shortening of the corpus callosum. The shrunken cortex shows "the loss of vital brain tissue that control's [sic] an individual's ability to analyze information, organize, control and direct his behavior and emotions, solve problems and learn from his own experiences." (Pet'r's Br. 24.) Muhammad claims that this is the result of severe beatings he received as a child. The cavum septum pellucidum is a space in the brain that should close during childhood, but Muhammad's did not. He notes a relationship between a cavum septum pellucidum and psychoses and schizophrenia. There is a similar relationship between schizophrenia and a shortened corpus callosum.

Additionally, Muhammad presents a topographic display that shows the damage to his brain, as indicated by shades of color. (Pet'r's Br. 27.) The display was created for his habeas petition, but Muhammad alleges that his trial attorneys knew the information at the time of his pro se request. Moreover, an IQ test, the WAIS-III, indicated that his performance was below seventy-three percent of other men his age. Dr. Dorothy Lewis, a psychiatrist, determined that although Muhammad could display a "superficial brightness," (J.A. 2549)[3] he

---

[3]Although Dr. Lewis references the period from September through October 2003—before Muhammad's first trial—in her declaration, the declaration is dated December 2007 and was prepared for Muhammad's federal habeas proceedings below.

was not competent to represent himself (*Id.*; *see also* J.A. 2052-54).[4] Finally, Muhammad alleges that his trial attorneys knew that he had been diagnosed with schizophrenia and bipolar disorder. Muhammad contends that all of this evidence should have led his trial attorneys to object to his representing himself and prevented them from calling him "very bright" when the judge questioned them about Muhammad's ability to represent himself. (J.A. 214-15.)

Even if we assume that his attorneys should have objected to Muhammad's self-representation, the state and district courts found that Muhammad did not show that he was prejudiced, since he represented himself for only two days during the government's presentation of its case, and his defense attorneys were heavily involved as standby counsel, preserving objections to the government's evidence and attempting to "play as full a role as the court [would] allow." (J.A. 215.) Muhammad points only to the fact that eighteen witnesses were presented, including the government's sniper expert, and that he made ramblings in front of the jury that damaged its view of him. However, Muhammad does not point to any evidence that was improperly received and considered by the jury, or any potentially prejudicial piece of evidence. Thus, the decision of the state courts on Muhammad's IAC claim was not an unreasonable application of clearly established law.[5]

---

[4]Dr. Lewis's competency evaluation, dated March 27, 2006, was prepared for Muhammad's Maryland trial, not the Virginia trial at issue, although it was utilized during his state habeas proceedings.

[5]We note that Muhammad desires us to factor into our consideration the standard for competence to stand trial set forth in *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam)): "whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" Specifically, Muhammad asks the Court to consider whether there is a "reasonable probability . . . that, had his trial counsel raised the issue of his competency, he would have been found incompetent." (Pet'r's Br. 61.)

## C.

According to Muhammad, the district court further erred when it excluded all defense expert testimony during the penalty phase of his trial as a sanction for failing to submit to an interview by the Commonwealth's psychiatrist. Muhammad had planned to present the opinion of Dr. Mark Cunningham, a psychologist who had interviewed Muhammad's friends and family, in order to show how his upbringing influenced his subsequent adult actions, including the shootings at issue. Muhammad did not plan to use Dr. Cunningham in order to

---

Muhammad's claim, however, is one of ineffective assistance of counsel, not mental incompetence to stand trial. The two are separate inquiries, and Muhammad does not pursue the latter. Instead, he argues that if his attorneys had raised the competency issue, then the judge would have possibly ordered a competency hearing, and "if examined for competency, there is at least a reasonable probability that Muhammad would not have been found competent to represent himself." (Pet'r's Br. 65-66.) But even if all of the conditions in Muhammad's far-fetched hypothetical had been met, the result simply would have been an inability to represent himself. It is by no means certain that the judge would have gone further to rule him incompetent to stand trial.

At oral argument, counsel for Muhammad contended that it was structural error to allow the appellant to represent himself while incompetent. But again, Muhammad's competence is not at issue, and it is unclear how structural error should factor into our analysis at all since it would require us to presume Muhammad to be incompetent. Indeed, it is unclear whether a structural error even exists in the form in which Muhammad wishes to use it. *See Neder v. United States*, 527 U.S. 1, 8 (1999) (noting that the Supreme Court has "found an error to be 'structural,' and thus subject to automatic reversal, only in a very limited class of cases" and listing cases that do not encompass the present situation (internal quotation omitted)). We would only be speculating if we were to hold that, had his counsel objected, Muhammad (possibly) would have been found incompetent and that, moreover, he was indeed incompetent and therefore it was structural error to allow him to represent himself during that limited portion of his trial in which he did so. We reject this argument and find that the *Strickland* standard alone, not in conjunction with the *Drope* standard, applies to this case.

present a psychiatric defense to his crimes. Instead, he argues, Dr. Cunningham would have been used only in mitigation so that he would receive life imprisonment instead of death. The defense attorneys concluded that they could not introduce the lay testimony without Dr. Cunningham because "only Dr. Cunningham could provide the jury a conceptual basis for assessing Muhammad's moral culpability and understanding the truly mitigating character of this evidence." (Pet'r's Br. 41.)

The lay testimony that the defense attorneys would have presented included accounts from Muhammad's sister, Aurolyn Williams, who would have testified that their mother died of breast cancer while they were young. The children then moved into their grandparents' three-bedroom house, where they lived with twenty other people and were beaten, forced to eat black-eyed peas separately from everyone else every night, prevented from entering the house during the day, and never told their birthdays until they were older. Another of Muhammad's sisters, Bessie Williams, would have testified similarly. His brother, Edward Williams, would have testified about how their uncle, Felton Holiday—a reform school guard convicted of battery with a dangerous weapon in 1962 for beating a minor to death—constantly attacked them. Muhammad was allegedly forced to place his hand on a spark plug while his grandfather, Guy Holiday, pulled the cord.

According to the Supreme Court of Virginia:

> Consideration of Muhammad's arguments on these matters requires a clear understanding of what the trial court ruled concerning these issues. The trial court ruled that Muhammad could not present expert testimony on mitigation factors at sentencing because of his refusal to abide by the trial court's order to submit to an evaluation by the Commonwealth. *The trial court did not bar the presentation of non-expert testimony on this issue.* Thereafter,

Muhammad sought the ability to present limited expert testimony purporting not to be based upon expert interviews. The Commonwealth objected. *The trial court overruled the Commonwealth's objection and gave Muhammad the opportunity to present evidence out of the presence of the jury that would allow the trial court to rule on its admissibility. Muhammad did not take advantage of this invitation.* Only after all the evidence was presented at the sentencing phase and both parties rested their case did Muhammad offer an affidavit as a proffer of Dr. Cunningham's testimony. He may not be heard to complain about the exclusion of Dr. Cunningham's limited testimony when he did not give the trial court the contemporaneous opportunity to evaluate its admissibility.

*Muhammad v. Virginia*, 619 S.E.2d at 47 (emphasis added). Pursuant to its Rule 5:25,[6] the Supreme Court of Virginia found that Muhammad had waived his argument about the trial court's failure to allow Dr. Cunningham to testify only as to his risk for future dangerousness. Additionally, we emphasize once more that the trial court did allow Muhammad to present the testimony outside of the presence of the jury so that the court could determine its admissibility, but Muhammad chose not to take advantage of the opportunity. The district court found this claim therefore to be procedurally defaulted, and our precedent supports this decision. *E.g.*, *Weeks v. Angelone*, 176 F.3d 249, 270 (4th Cir. 1999).

The district and state courts also found that Muhammad knowingly waived his right to present expert mitigation testi-

---

[6]The Rule states: "Error will not be sustained to any ruling of the trial court or the commission before which the case was initially tried unless the objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."

mony: "Muhammad is correct that limiting the evidence that a criminal defendant may present in his defense implicates numerous constitutional rights. What Muhammad fails to appreciate is that he may, by his knowing and informed decisions, waive such rights." *Muhammad v. Virginia*, 619 S.E.2d at 48. The trial court informed Muhammad, pursuant to Va. Code Ann. § 19.2-264.3:1 (2003), that if he did not submit to a psychiatric evaluation by the government's experts, he would not be able to present expert testimony of his own. Muhammad indicated that he understood. (J.A. 79-80.) After Muhammad refused to be examined by the government's psychiatrist, the trial court once again questioned him about the consequences of his doing so, and he once again indicated that he understood. (J.A. 170.) Thus, the state court's determination that Muhammad waived the presentation of expert mitigation evidence was neither inconsistent with the facts in the record nor contrary to clearly established law.

Muhammad believes that the outcome of this claim is governed by *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality), and *Taylor v. Illinois*, 484 U.S. 400 (1988), and not by *Buchanan v. Kentucky*, 483 U.S. 402 (1987), which the district and state court relied upon. In *Buchanan*, the Supreme Court held that "if a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id.* at 422-23; *see also Savino v. Murray*, 82 F.3d 593, 604 (4th Cir. 1996) ("When a defendant asserts a mental status defense and introduces psychiatric testimony in support of that defense, he may face rebuttal evidence from the prosecution taken from his own examination or he may be required to submit to an evaluation conducted by the prosecution's own expert.") The district and state courts read *Buchanan* to uphold Virginia's rule requiring Muhammad to submit to reciprocal examination if he wanted to present his own expert testimony. Muhammad argues, however, that he did not purport to present psychiatric evidence,

just evidence of his "reduced moral culpability" due to his family background. (Pet'r's Br. 84.) However, Dr. Cunningham would have performed a psychiatric evaluation on Muhammad that could have informed his view of Muhammad's background. Hence, the state also was entitled to perform an evaluation, and the state courts' so holding is reasonable in light of the Supreme Court's decision and our precedent.

### D.

Muhammad believes that the district court erred when it did not allow him the full 365-day statutory filing period in order to file his habeas petition and when it limited the petition to fifty pages. Upon subsequent motions by Muhammad, the district court extended its original sixty-day deadline by thirty days, raised the page limit to eighty pages, and granted Muhammad leave to amend the petition within ninety days from that deadline. Muhammad did as the court instructed. Three months after the court's deadline, but before the expiration of the statute of limitations, Muhammad filed another motion to amend along with his second amended petition, which Muhammad contends developed his *Brady* claims more extensively. The district court denied leave to amend. We review these claims for abuse of discretion. *Hill v. Ozmint*, 339 F.3d 187, 193 (4th Cir. 2003).

According to 28 U.S.C. § 2244(d)(1) (2006): "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." Muhammad cites no case law that has found that a district court must grant a petitioner an entire year in order to file his habeas petition. Moreover, even if we assume that the district court erred in denying Muhammad an entire year in which to file his petition, "the trial court's error must have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Tuggle v. Netherland*, 79

F.3d 1386, 1393 (4th Cir. 1996) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Muhammad claims that if he had been allowed the full limitations period, he would have been able to produce more inconsistent testimony, more exculpatory witness statements, more evidence that Muhammad and Malvo were not at the Parker shooting, evidence that a shooter in a white box truck was responsible for the Ramos shooting (including evidence that one Danaus Ford drove a white box truck that contained gunshot residue and owned a .223-caliber firearm, claimed to be God, and had unsuccessfully attempted to get into sniper school), and he would have developed the claims in his first amended petition at greater length. However, Muhammad's problem is that, given the abundance of evidence against him, none of these things likely would have resulted in a different outcome, and thus he can show no prejudice. Therefore, any error in denying Muhammad the full statutory period in which to file his petition was harmless.

### E.

Finally, Muhammad argues that the district court erred in not providing him with expert assistance or with an evidentiary hearing to develop his claims of ineffective assistance of counsel and incompetence. According to the district court, "the record, viewed in light of the forecasted evidence, would not entitle the petitioner to an evidentiary hearing on his claims, nor would the petitioner be able to win on the merits regardless of the experts' findings." (J.A. 2987.) The district court is given discretionary authority to provide for expert assistance by 18 U.S.C. § 3599(f) (2006):

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such

services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor . . . .

Moreover, 28 U.S.C. § 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Given the foregoing discussion of Muhammad's IAC and incompetence claims, and the deficiencies therein, the district court's decisions to deny further expert assistance and to deny Muhammad an evidentiary hearing were not abuses of discretion. *See Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998).

## IV.

After a full review of the record and Muhammad's claims, we conclude that we must affirm the decision of the district

court. Muhammad's petition for a writ of habeas corpus is hereby denied.

*AFFIRMED*