# VIRGINIA:

*In the Supreme Court of Virginia held at the Supreme Court Building in the City of Richmond on* Friday *the* 31st *day of* October, 2014.

Present: All the Justices

Mark Eric Lawlor,                                                      Petitioner,

  against        Record No. 131972

Keith W. Davis, Warden, Sussex I
  State Prison,                                                        Respondent.


Upon a Petition for a Writ of Habeas Corpus


Upon consideration of the petition for a writ of habeas corpus filed December 16, 2013, and the respondent's motion to dismiss, the Court is of the opinion that the motion should be granted and that the writ should not issue.

Mark Eric Lawlor was convicted in the Circuit Court of Fairfax County of capital murder in the commission of, or subsequent to, rape or attempted rape, Code § 18.2-31(5), and capital murder in the commission of abduction with intent to defile, Code § 18.2-31(1), and was sentenced to death on each conviction. This Court affirmed Lawlor's convictions and upheld his sentences of death in Lawlor v. Commonwealth, 285 Va. 187, 738 S.E.2d 847, cert. denied, ___ U.S. ___, 134 S.Ct. 427 (2013).

The victim, Genevieve Orange, was found on the floor of the living area of her studio apartment. The door to Orange's apartment was unlocked and there were no signs of forced entry. Orange had been struck at least 47 times with one or more blunt objects. Some of Orange's wounds were consistent with having been

struck with a frying pan. Others were consistent with having been struck with a hammer. Subsequent medical examination established that Orange had aspirated blood and sustained defensive wounds to her hands and arms, indicating she had been alive and conscious during some part of the beating.

Orange's body lay near her couch, which was saturated with blood. She was naked from the waist down, her bra and t-shirt had been pushed up over her breasts, and semen was smeared on her abdomen and right thigh. Her soiled and bloodied shorts and underpants had been flung to the floor nearby. A bent metal pot was found near Orange's body. Its wooden handle had broken off and was found in the kitchen sink, near a bent and bloody metal frying pan.

Lawlor resided in Orange's apartment building. He also worked there as a leasing consultant and had access to keys to each apartment. Testing of the semen on Orange's abdomen and thigh showed DNA consistent with Lawlor's DNA. At trial, Lawlor's attorneys admitted Lawlor had killed Orange, but contested the allegations of premeditation, rape and abduction.

CLAIMS (I), (II) & (V)

In claims (I) and (II), Lawlor alleges the Commonwealth failed to disclose exculpatory information as required by Brady v. Maryland, 373 U.S. 83 (1963), and presented false testimony or allowed it to go uncorrected in violation of Napue v. Illinois, 360 U.S. 264 (1959), and Giglio v. United States, 405 U.S. 150 (1972).

As the Court has stated previously:

In Brady [], the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

2

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [373 U.S.] at 87.

    . . . .

Exculpatory evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. "A reasonable probability" is one which is sufficient to undermine confidence in the outcome of the proceeding.

Muhammad v. Warden, 274 Va. 3, 4, 646 S.E.2d 182, 186 (2007) (citations omitted). Furthermore, this Court has previously held that, "to find that a violation of Napue occurred . . . , we must determine first that the testimony [at issue] was false, second that the prosecution knew of the falsity, and finally that the falsity affected the jury's judgment." Teleguz v. Commonwealth, 273 Va. 458, 492, 643 S.E.2d 708, 729 (2007).

In a portion of claims (I) and (II), Lawlor alleges Detective John Tuller lied in his curriculum vitae, which the Commonwealth submitted to the defense pursuant to Code § 19.2-264.3:4, with its notice of intent to introduce expert testimony. The notice named Tuller as the Commonwealth's expert in bloodstain pattern interpretation. In his curriculum vitae, Tuller stated he had testified as an expert in bloodstain pattern interpretation in six cases. However, in two of the cases Tuller identified, he testified only as a fact witness. Tuller further stated he was a current member of the International Association of Bloodstain Pattern Analysts (IABPA). However, Tuller's membership with the IABPA had expired. Tuller claimed he attended a crime scene investigation seminar at the Miami Metro-Dade Police Training Institute. However, the Miami Metro-Dade Police Department has no

3

record of his attendance. Finally, Tuller represented that in 2003 he attended the Bloodstain Users Group Seminar at the Virginia Department of Forensic Science (DFS). However, DFS denied ever presenting such a seminar.

The Court rejects these portions of claims (I) and (II). The record, including the affidavits of Lawlor's counsel and the manuscript record, demonstrates that the alleged inconsistencies in Tuller's curriculum vitae were known or available to Lawlor at the time of his trial. Thus, the Court holds that these portions of claims (I) and (II) are barred because these non-jurisdictional issues could have been raised at trial and on direct appeal and, thus, are not cognizable in a petition for a writ of habeas corpus. Slayton v. Parrigan, 215 Va. 27, 29, 205 S.E.2d 680, 682 (1974), cert. denied, 419 U.S. 1108 (1975).

In another portion of claims (I) and (II), Lawlor contends Tuller lied in his testimony to the trial court when questioned about his expert qualifications. At trial, Tuller repeated his assertion he had testified as an expert in bloodstain pattern interpretation in six cases. Tuller also stated all six cases were homicides, and that the defendant in each case was convicted. However, Tuller testified as an expert in only four cases. Additionally, according to Tuller's curriculum vitae, one of the cases in which he had testified as an expert involved a malicious wounding and not a homicide. Finally, of the six cases Tuller identified in his curriculum vitae, one was Lawlor's preliminary hearing, which had not, at the time of Tuller's testimony, resulted in a conviction.

4

The Court rejects these portions of claims (I) and (II). Because the alleged inconsistencies in Tuller's representation of his qualifications were known or available to Lawlor at the time of his trial, the Court holds that these portions of claims (I) and (II) are barred. These non-jurisdictional issues could have been raised at trial and on direct appeal and, thus, are not cognizable in a petition for a writ of habeas corpus. Slayton, 215 Va. at 29, 205 S.E.2d at 682.

In claim (V), Lawlor argues he was denied the effective assistance of counsel because counsel failed to investigate and confront Detective Tuller's representations regarding his qualifications to testify as an expert. Lawlor contends that had counsel challenged Tuller's expert qualifications, there is a reasonable probability that the court would have sustained Lawlor's objection to Tuller's certification as an expert witness, that his testimony would have been precluded, and that he would not have been convicted of capital murder. Lawlor argues that had Tuller not testified, the Commonwealth would have had no evidentiary basis to argue Lawlor abducted Orange by moving her from the couch to the floor. Lawlor further contends that without Tuller's testimony, prosecutors would not have been able to rely on his opinions to argue Lawlor was capable of premeditation. Lawlor contends the Commonwealth relied on Tuller's opinion that Lawlor had tried to clean up the crime scene after the murder to demonstrate premeditation. Lawlor further contends the Commonwealth relied on Tuller's expert opinion to show the victim was in a vulnerable position when she was attacked. Finally, Lawlor contends that had Tuller been permitted to testify as an expert in bloodstain pattern

5

interpretation despite counsel's objections, counsel could have used his false statements to impeach him before the jury.

The Court holds that claim (V) fails to satisfy the prejudice prong of the two-part test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984). The record, including Tuller's affidavit and attached exhibits and the affidavit of Lawlor's trial counsel, demonstrates that Tuller's curriculum vitae contained multiple errors. Of the six cases in which Tuller claimed to have testified as an expert in bloodstain pattern interpretation, he had testified as an expert in only four. Tuller was not a current member of the IABPA, his membership having expired years before Lawlor's trial. Tuller attended the Miami-Dade Police Training Institute's Crime Scene Investigation Seminar in January 2003, not January 2002, as Tuller stated. The Bloodstain Users Group Seminar Tuller attended in 2003 was not a 40-hour course and was not presented by DFS, as Tuller's curriculum vitae stated. Although Lawlor's counsel was aware of at least one of the discrepancies in Tuller's curriculum vitae before trial, counsel failed to pursue an adequate investigation or even ask Tuller about it during their pretrial interview with him. In addition, Tuller's testimony that he had testified as an expert in bloodstain pattern interpretation in six cases and that all six had been murder cases and had resulted in convictions was clearly incorrect and inconsistent with Tuller's curriculum vitae. Counsel, however, failed to question Tuller about the discrepancies.

Assuming, without deciding, that these inaccuracies would have precluded Tuller from testifying as an expert or, had he been permitted to testify as an expert, would have impeached his

6

expertise, Lawlor cannot show a reasonable probability of a different outcome. Tuller's expert testimony was not crucial to prove Lawlor abducted Orange. The Commonwealth was not required to present evidence that Lawlor moved Orange from the couch to the floor to prove he abducted her. "[T]he physical detention of a person, with the intent to deprive him of his personal liberty, by force, intimidation, or deception, without any asportation of the victim from one place to another, is sufficient." Scott v. Commonwealth, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984). The record, including the trial transcript, demonstrates there was overwhelming evidence to prove Lawlor used force to physically detain Orange. Dr. Constance DiAngelo, an Assistant Chief Medical Examiner and forensic pathologist, testified Orange sustained "severe, heavy trauma" when she was stuck in the head and face over thirty times with a blunt object. Some of the blows left divots in Orange's skull, which was fractured so badly that it opened as if it were hinged. Dr. DiAngelo testified Orange sustained at least seventeen additional defensive wounds to her hands and arms. Combined with the blood in her lungs, this indicated Orange was alive for at least part of the attack. The jury did not require Tuller's expert opinion to conclude that Lawlor detained Orange by physical force.

In addition, the jury could reasonably infer, without the benefit of Tuller's expert testimony, that Lawlor moved Orange from the couch to the floor. Dr. DiAngelo testified that the trauma to Orange's head occurred while she was on the couch. Orange was discovered lying on the floor, flat on her back, perpendicular to the couch, with her feet near the end of the couch where the pool

7

of blood from her head was. The jury could reasonably infer from this evidence that Orange did not willingly move from the couch to the floor.

Further, DiAngelo's testimony and the Commonwealth's photographs of the blood-soaked couch left no reasonable doubt that Orange was attacked there. Finally, the Commonwealth did not rely on Tuller's expert testimony to argue premeditation. Rather, to show premeditation, the Commonwealth relied on the location, force and number of blows to Orange; evidence of Lawlor's rational, competent behavior while purchasing and consuming drugs with Michael Johnson, who had facilitated Lawlor's purchase of drugs; Lawlor's ability to plan, as evidenced by his obtaining the victim's keys, traveling to her apartment, and using a back exit to avoid detection after the murder; the obvious evidence of his ineffectual attempts to clean up the crime scene by placing the bloody pan and broken handle in the kitchen; his evident disposal of the hammer and his bloody clothes; and his lying about his knowledge of the crime. Thus, Lawlor has failed to demonstrate that there is a reasonable probability that, but for the errors alleged in claim (V), the result of the proceeding would have been different.

CLAIM (III)

In claim (III)(A), Lawlor contends he was denied the right to plead guilty and to have his sentence determined by a jury. Lawlor contends that under Code § 19.2-257, to plead guilty a defendant must waive his right to have a jury determine his sentence. Lawlor argues that when applied to a defendant charged with a capital offense, Code § 19.2-257 violates the Sixth Amendment under the

8

decisions in Blakely v. Washington, 542 U.S. 296 (2004), Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000), because it requires the judge to determine the appropriate sentence on the basis of facts not "reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303-04.

The Court holds that claim (III)(A) is barred because this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus. Slayton, 215 Va. at 29, 205 S.E.2d at 682.

In claim (III)(B), Lawlor contends he was denied the effective assistance of counsel because counsel failed to protect his right to plead guilty and to have the aggravating factors of vileness and future dangerousness, which must be proven beyond a reasonable doubt before a sentence of death may be imposed, determined by a jury. Lawlor contends counsel should have argued that Code § 19.2-257 violates the Sixth Amendment because it requires the judge to determine the appropriate sentence on the basis of facts not "reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303-04.

The Court holds that claim (III)(B) fails to satisfy the prejudice prong of the two-part test enunciated in Strickland. Under Code § 19.2-264.4, the sentencing jury must consider, among other things, "the circumstances surrounding the offense." It is the jury's duty to consider all the evidence, both favorable and unfavorable, before fixing punishment. Stamper v. Commonwealth, 220 Va. 260, 275-76, 257 S.E.2d 808, 819 (1979). Thus, even if Lawlor had been permitted to plead guilty and have his sentence

9

determined by a jury, the sentencing jury necessarily would have had access to the evidence presented in the guilt phase of Lawlor's trial, including the evidence adduced at trial of the brutal nature of Lawlor's crimes. In addition, although Lawlor argues a guilty plea would have permitted him to show remorse and accept responsibility in front of the jury, the record, including the trial transcript, demonstrates that counsel effectively proceeded as if Lawlor had entered a guilty plea. From opening statement through the end of trial, Lawlor's trial counsel conceded Lawlor had murdered Orange. The record further establishes that the crimes were extremely brutal, that the victim suffered significantly, that immediately after the murder Lawlor insisted he had no knowledge of the crimes and attempted to cast suspicion on his neighbor, and that after his DNA was discovered on the victim, Lawlor insisted he was being framed. Under the circumstances, Lawlor cannot show that had he been permitted to plead guilty and have his sentence determined by a jury, the jury would have reached a different outcome. Thus, Lawlor has failed to demonstrate that there is a reasonable probability that, but for the errors alleged in claim (III)(B), the result of the proceeding would have been different.

CLAIM (IV)

In claim (IV)(A) and a portion of claim (IV)(C), Lawlor contends he was denied a fair trial because the prosecution used four of its five peremptory strikes to remove all persons of Hispanic and Pacific-Island ethnicity from the jury venire and the trial court failed to ensure those strikes were not based upon the ethnicity of the jurors.

10

The Court holds that claim (IV)(A) and this portion of claim (IV)(C) are barred because these non-jurisdictional issues could have been raised at trial and on direct appeal and, thus, are not cognizable in a petition for a writ of habeas corpus. Slayton, 215 Va. at 29, 205 S.E.2d at 682.

In claim (IV)(B) and another portion of claim (IV)(C), Lawlor contends he was denied the effective assistance of counsel because counsel failed to object to the Commonwealth's removal of all persons of Hispanic and Pacific-Island ethnicity from the jury venire. The Commonwealth used peremptory strikes to remove Gloria Alvarez, Fredericka Wall, Venecia Fernandez, and Dave Lunasco from the venire of twenty-four qualified jurors. Lawlor alleges that Alvarez, Wall, and Fernandez were the only members of the panel of Hispanic ethnicity, and that Lunasco was the only person of Pacific-Island ethnicity. Lawlor contends that the removal of all Hispanic and Pacific-Island jurors was prima facie evidence of discrimination, and that counsel unreasonably failed to object to their exclusion.

The Court holds that claim (IV)(B) and this portion of claim (IV)(C) satisfy neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. The principles applicable to challenges of racial motivation for the exercise of peremptory strikes on a jury panel initially were set out by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986), and subsequently have been refined in decisions of this Court.

11

As the Court has stated previously:

When a defendant makes a Batson challenge to the use of a peremptory strike, he must show that the individual "is a member of a cognizable racial group," and "make a prima facie showing that the peremptory strike was made on racial grounds." Mere exclusion of members of a particular race by using peremptory strikes "does not itself establish such a prima facie case under Batson." To establish a prima facie case, the defendant must also "identify facts and circumstances that raise an inference that potential jurors were excluded based on their race."

Juniper v. Commonwealth, 271 Va. 362, 407, 626 S.E.2d 383, 412 (2006)(internal citations omitted)(citing Yarbrough v. Commonwealth, 262 Va. 388, 394, 551 S.E.2d 306, 309 (2001) (quoting Batson, 476 U.S. at 96), and Jackson v. Commonwealth, 266 Va. 423, 436, 587 S.E.2d 532, 542 (2003)).

Once a defendant makes a prima facie case, the burden shifts to the Commonwealth "to produce race-neutral explanations for striking the juror." Juniper, 271 Va. at 407, 626 S.E.2d at 412 (quoting Jackson, 266 Va. at 436, 587 S.E.2d at 542). The defendant can then argue the Commonwealth's explanations were a pretext for unconstitutional discrimination. Id.

Lawlor has failed to establish a prima facie case of purposeful discrimination that counsel should have recognized and challenged, and that the trial court would have accepted. Although Lawlor asserts that the Commonwealth's peremptory strikes resulted in the exclusion of all persons of Hispanic and Pacific-Island ethnicity from the jury, he proffers no basis for his assertion that the strikes were racially motivated other than observing that four of the five jurors struck by the Commonwealth were either of

12

Hispanic or Pacific-Island ethnicity. Lawlor does not assert that the jurors the Commonwealth chose to strike were members of the same race as either Lawlor or the victim, or identify any other "'facts and circumstances that raise an inference that potential jurors were excluded based on their race.'" Juniper, 271 Va. at 407, 626 S.E.2d at 412 (quoting Yarbrough, 262 Va. at 394, 551 S.E.2d at 309). Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.[1]

## CLAIM (VI)

In a portion of claim (VI), Lawlor contends he was denied the effective assistance of counsel because counsel failed to ask Dr. W. Alexander Morton, Jr., a psychopharmacologist appointed by the trial court to assist Lawlor, to opine whether consumption of "the better part of a case of beer and at least two to three eight-balls of crack cocaine" would render a person incapable of deliberation and premeditation. Lawlor contends that when the Commonwealth objected to such testimony and the trial court ruled it was inadmissible, trial counsel unreasonably agreed not to present such evidence without first arguing it was admissible. In support of this claim, Lawlor has provided an affidavit from Morton in which he states his opinion, to a reasonable degree of scientific

---

[1] The Court rejects Lawlor's assertion that he is not required to show prejudice under Strickland. Counsel's failure to object to the Commonwealth's peremptory strikes is not a "structural error." See Jackson v. Warden, 271 Va. 434, 436, 627 S.E.2d 776, 781 (2006).

13

certainty, that Lawlor would not have been able to form the necessary intent to premeditate after ingesting that quantity of alcohol and cocaine.

The Court holds that this portion of claim (VI) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. The proffered expert opinion, that Lawlor did not premeditate at the time of the killing, was properly ruled inadmissible because it went to the "precise or ultimate fact in issue" in the case and "to have admitted the opinion would have invaded the province of the jury." Waye v. Commonwealth, 219 Va. 683, 696, 251 S.E.2d 202, 210 (1979)(internal quotation marks and citations omitted).

In addition, the record, including the trial transcript, demonstrates that on the evening before the murder, Lawlor and Michael Johnson purchased three "eight-balls," or approximately ten and a half grams, of cocaine and that together they consumed between eight and nine grams. Johnson testified he and Lawlor consumed all of the first and second "eight-ball," of which Johnson had consumed about two grams. Of the third eight-ball, of which Johnson and Lawlor consumed half, Johnson testified Lawlor had consumed about a gram of the cocaine and that he had consumed less than one gram. Johnson testified he and Lawlor had been drinking beer, but was unable to say how much beer Lawlor had actually consumed. Thus, the evidence established that Lawlor had consumed approximately six grams of cocaine and an unknown quantity of beer. Therefore, the proffered opinion, which assumed Lawlor consumed "the better part of a case of beer" and between seven and ten grams of cocaine, was not based on facts in evidence and would not have

14

been admissible. See Simpson v. Commonwealth, 227 Va. 557, 565-66, 318 S.E.2d 386, 391 (1984).

Further, the record, including the trial transcript, demonstrates that Morton testified as to the hypothetical effect that consumption of large quantities of cocaine and alcohol would have on a person in Lawlor's position. Morton testified that consuming alcohol and cocaine together negatively impacts an individual's ability to think rationally and make decisions and that the consumption of a large amount of alcohol and cocaine could cause violent behavior and cause an individual to become "unpredictable, impulsive, and unstable." Morton opined that a person consuming three and a half grams of cocaine over the course of an eight hour period would experience profound psychiatric symptoms, including inability to think clearly, paranoia, and aggression, and these symptoms would increase at higher doses, although the effects would vary depending on the individual. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (VI), Lawlor contends he was denied the effective assistance of counsel because counsel failed to provide Morton with an opportunity to interview Lawlor before trial. Lawlor contends that had Morton interviewed him, Morton would have been able to opine that Lawlor's prior drug use and addiction affected his reaction to the drugs he consumed in the hours before the murder and "further diminished his ability to premeditate and deliberate." Lawlor contends this opinion would

15

have opened the door to other evidence of his history of drug use and addiction, which the trial court had found to be inadmissible in the guilt phase of the trial.

The Court holds that this portion of claim (VI) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. Morton's opinion about Lawlor's susceptibility to the effects of the drugs he consumed before the murder would not have opened the door to evidence of his history of drug use and addiction. An expert may not relate hearsay evidence to the jury when providing his opinion testimony. Wright v. Commonwealth, 245 Va. 177, 197, 427 S.E.2d 379, 392 (1993), vacated on other grounds, 512 U.S. 1217 (1994); see also Buchanan v. Commonwealth, 238 Va. 389, 416, 384 S.E.2d 757, 773 (1989). Lawlor fails to proffer any evidence Morton could have gleaned from an interview with him that would have been admissible. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

CLAIMS (VII) & (VIII)

In claim (VIII)(A), Lawlor contends the jury instructions were defective because they failed to define specific intent, instructed the jury they could infer Lawlor's intent from the natural and probable consequences of his acts, and failed to distinguish between premeditated first degree murder and first degree murder in the commission of rape or abduction.

The Court holds that claim (VIII)(A) is barred because this non-jurisdictional issue could have been raised at trial and on

16

direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus.  Slayton, 215 Va. at 29, 205 S.E.2d at 682.

In a portion of claim (VIII)(B), Lawlor contends he was denied the effective assistance of counsel because counsel failed to request instructions defining specific intent, stating that specific intent differs from general intent, and explaining the difference between the two.  Lawlor contends that without such instructions, jurors would not have understood that they had to find that Lawlor had the specific intent to kill Orange, and that it was not sufficient to find he had the general intent to do an act that resulted in her death, before convicting him of capital murder or premeditated first degree murder.

The Court holds that this portion of claim (VIII)(B) does not satisfy the performance prong of the two-part test enunciated in Strickland.  Generally, courts now disfavor instructing jurors on specific versus general intent and the difference between the two.  See, e.g., United States v. Perez, 43 F.3d 1131, 1138 (7th Cir. 1994) (noting instructions distinguishing between specific and general intent are not as helpful to juries as those stating the "precise mental state required for the particular crime"); United States v. Laughlin, 26 F.3d 1523, 1527 (10th Cir. 1994) (noting instructing jury in terms of specific intent has been disfavored because of the confusing and ambiguous nature of such instructions); see also United States v. Jobe, 101 F.3d 1046, 1059 (5th Cir. 1996)(no error in failing to give instruction defining specific intent where trial court instructed jury on element of intent and clearly defined the term "knowingly"); cf. Dixon v. United States, 548 U.S. 1, 7 (2006) (recognizing "the movement away

17

from the traditional dichotomy of general versus specific intent and toward a more specifically defined hierarchy of culpable mental states").

Here, the record, including the trial transcript and the jury instructions, demonstrates the jury was instructed that to find Lawlor guilty of capital or premeditated first degree murder, they had to find the killing was willful, deliberate, and premeditated. The jury was further instructed:

> willful, deliberate, and premeditated means a specific intent to kill adopted at some time before the killing but which need not exist for any particular length of time. An intent to kill may be formed only a moment before the fatal act is committed, provided the accused has time to think and did intend to kill.

This instruction properly instructed the jury about the requisite intent necessary to support a finding of premeditated murder. Any additional definition of the term specific intent, which was itself used to define "willful, deliberate, and premeditated," would have been redundant and potentially confusing, and counsel was not deficient for failing to make a contrary argument. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient.

In another portion of claim (VIII)(B), Lawlor contends he was denied the effective assistance of counsel because counsel failed to adequately object to a jury instruction that instructed the jury they could infer Lawlor's intent from the natural and probable consequences of his acts. Lawlor contends that although this instruction has been approved by this Court, it was improper in this case because it suggested the jury could determine it was Lawlor's purpose to kill Orange because the natural and probable

18

consequence of his conduct was to cause her death. Lawlor argues this blurs the distinction between specific intent to kill and general intent to do an act which, while not intended to do so, results in death.

The Court holds that this portion of claim (VIII)(B) does not satisfy the performance prong of the two-part test enunciated in Strickland. The natural and probable consequence of striking Orange 47 times with a blunt object, principally in the head, was her death. The instruction properly permitted, but did not require, the jury to infer from the fact that when Lawlor struck her 47 times with a blunt object, he intended to kill her. Counsel was not ineffective for failing to object to this instruction. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient.

In another portion of claim (VIII)(B) and a portion of claim (VII), Lawlor contends he was denied the effective assistance of counsel because counsel failed to ask that the instructions on first degree murder use the terms "premeditated first degree murder" and "felony first degree murder" to differentiate between premeditated first degree murder and first degree murder in the commission of rape, attempted rape, or abduction. Lawlor contends the instructions given were confusing because they used the term "first degree murder" to describe two different theories under which Lawlor could be convicted of first degree murder. Lawlor argues the lack of a descriptive label in the instructions could have confused the jury because under Virginia law, voluntary intoxication is a defense only to premeditated murder, and not to felony first degree murder. He further argues that the lack of a

19

descriptive label could also have confused the jury because in closing argument counsel conceded Lawlor was guilty of first degree murder. Although counsel argued Lawlor was incapable of premeditation and that the murder occurred during an altercation, the jury could have been confused and assumed counsel was conceding premeditation because the instruction did not clearly label the different theories of first degree murder.

The Court holds that these portions of claims (VIII)(B) and (VII) do not satisfy the performance prong of the two-part test enunciated in Strickland. The record, including the trial transcript, demonstrates that the jurors were instructed:

> The defendant is charged with the crime of capital murder in the commission of or subsequent to rape or attempted rape. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> (1) That the defendant killed Genevieve Orange; and
> (2) That the killing was willful, deliberate, and premeditated; and
> (3) That the killing was of a person in the commission of, or subsequent to rape or attempted rape.
>
> If you find the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty of capital murder in the commission of or subsequent to rape or attempted rape and shall not fix the punishment until your verdict has been returned and further evidence is heard by you.
>
> If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt the defendant killed Genevieve Orange and that the killing occurred in the

20

commission of, or subsequent to rape or attempted rape, but that the killing was not willful, deliberate and premeditated, then you shall find the defendant guilty of first degree murder and shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

If you find from the evidence that the Commonwealth has not proven beyond a reasonable doubt that the killing occurred in the commission of, or subsequent to rape or attempted rape but the Commonwealth has proved beyond a reasonable doubt:

(1) That the defendant killed Genevieve Orange; and
(2) That the killing was willful, deliberate, and premeditated; and
(3) That the killing was malicious,

then you shall find the defendant guilty of first degree murder and shall not fix the punishment until your verdict has been returned and further evidence has been heard by you.

If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt that the defendant killed Genevieve Orange and that the killing was malicious but that the Commonwealth has not proven beyond a reasonable doubt that the killing was willful, deliberate and premeditated and was not in the commission of, or subsequent to rape or attempted rape, then you shall find the defendant guilty of second degree murder but shall not fix the punishment until your verdict has been returned and further evidence is heard by you.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt any of the crimes listed above, then you shall find the defendant not guilty.

The jury received a nearly identical instruction on the charge of capital murder in the commission of abduction with intent to

21

defile. These instructions were not confusing. They clearly delineated the distinctions between capital murder; premeditated first degree murder; first degree murder in the commission of a rape, attempted rape or abduction; and second degree murder. Counsel was not ineffective for failing to argue to the contrary. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient.

In another portion of claim (VII), Lawlor contends he was denied the effective assistance of counsel because counsel failed to realize, until the end of the guilt phase of the trial, that Lawlor could be convicted of first degree murder even if the jury found he was incapable of premeditation, if the jury found he killed Orange in the commission of rape or abduction. Lawlor argues that because counsel failed to understand the applicable law, counsel based Lawlor's guilt-phase defense on the theory that Lawlor was so intoxicated at the time of the offenses that he was incapable of premeditation.

The Court holds that this portion of claim (VII) fails to satisfy the prejudice prong of the two-part test enunciated in Strickland. Lawlor fails to identify any defense theory that counsel could have, but did not, argue because of counsel's alleged failure to recognize that Lawlor could be convicted of first degree felony murder, or to show that such a defense would have been successful. See Hinton v. Alabama, 571 U.S. __, __, 134 S. Ct. 1081, 1089 (2014)(per curiam)(even where counsel makes a mistake of law, petitioner challenging a criminal conviction still bears the burden of showing a reasonable probability that, absent counsel's error, the factfinder would have had a reasonable doubt as to

22

petitioner's guilt). Thus, Lawlor has failed to demonstrate that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (VII), Lawlor contends he was denied the effective assistance of counsel because counsel focused closing argument almost exclusively on voluntary intoxication and asked the jury to find him guilty of first degree murder without differentiating between premeditated first degree murder and first degree felony murder. Lawlor argues this suggested to the jury that counsel was conceding the evidence proved premeditation.

The Court holds that this portion of claim (VII) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. The record, including the trial transcript, demonstrates that counsel argued during closing argument that Lawlor's crimes were not premeditated and the jury would not have reasonably believed counsel was conceding the evidence was sufficient to prove premeditation. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

CLAIM (IX)

In a portion of claim (IX), Lawlor contends he was denied the effective assistance of counsel because counsel failed to move for a mistrial when jurors overheard portions of a bench conference. Lawlor contends that in the guilt phase of the trial during counsel's cross examination of Detective Brian Colligan, counsel questioned why Colligan initially became suspicious of Lawlor. The

23

trial court called counsel to a bench conference, during which the prosecutor noted the answer to counsel's question included Lawlor's prior abduction conviction. The trial court told Lawlor's counsel he was about to cause a mistrial if he pursued the question and that the court was "not going to declare it if you do it." Lawlor contends defense counsel should have asked for a mistrial at that point, because the jury could hear both the prosecutor's statement and the trial court's admonishment of Lawlor's counsel. In support of this claim, Lawlor proffers the affidavit of Michael Chick, Jr., a member of Lawlor's defense team. Chick avers that the courtroom was small and that he could hear portions of most of the bench conferences, even from his position in the back of the courtroom, especially those that were "heated." Chick avers that during the conference about Colligan's testimony, he heard the trial court advise counsel "in an angry tone," that he "was not going to grant a mistrial if [counsel] continued with his line of questioning." Chick further avers that he told counsel that he heard "that conversation, and that it was likely that the jurors could hear it too."

The Court holds that this portion of claim (IX) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. Lawlor fails to proffer any support for his allegation that the jury overheard the prosecutor mention Lawlor's prior abduction conviction. Although Chick avers he overheard portions of many bench conferences, especially those that were heated, and that he specifically heard the trial court tell counsel he was not going to grant a mistrial, Chick does not state that he heard the prosecutor's remark or provide any reason to

24

believe the jury heard it. Lawlor does not suggest the prosecutor's voice was loud or "heated" when he made the comment, which appears to have been made specifically to prevent any evidence of the prior conviction from being inadvertently introduced during the guilt phase of the trial.

In addition, while "[r]ulings made in words or manner indicating antagonism or resentment toward counsel may convey the impression that the feeling includes also counsel's client," Compton v. Commonwealth, 190 Va. 48, 56, 55 S.E.2d 446, 450 (1949), the record in the present case, including the trial transcripts, does not demonstrate such "antagonism or resentment" in the trial court's admonishment of counsel during this bench conference. Assuming the jury heard the exchange, the trial judge's warning that counsel was about to cause a mistrial, which the court would not grant, likely suggested to the jury the court's displeasure with the possibility that counsel was about to do something that would negatively impact Lawlor or that counsel's behavior could potentially negatively impact Lawlor. Further, the trial court instructed the jury at the beginning of the trial that they were to base their verdict solely on the instruction of law and the evidence presented at trial, that "no statement or ruling or remark I might make from the bench is intended in any way to indicate to you what my personal opinion might be," that the purpose of a bench conference was to ensure that the only evidence received by the jury was that "which is appropriate and proper under our laws," and that the jury should not hold such conferences against either the Commonwealth or the defendant. "It is presumed that a jury will follow the instructions given by the trial court." Muhammad, 274

25

Va. at 18, 646 S.E.2d at 195 (citation omitted). Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (IX), Lawlor contends he was denied the effective assistance of counsel because counsel failed to move for a mistrial when jurors overheard portions of a second bench conference. Lawlor contends that while discussing last-minute changes to jury instructions, the trial court loudly admonished counsel, stating "[y]ou know, you've had this case for two years, and we're now sitting here-this is the best you can do with jury instructions?" Lawlor contends that during this conference the trial court further admonished counsel for failing to include an approved instruction with the written instructions presented to the court that morning, saying, "I gave you that pile back yesterday and said return those instructions to me." Lawlor alleges that these comments were audible to everyone in the courtroom, that they were prejudicial to him because they suggested defense counsel was unprepared and uninformed, and that defense counsel should have asked for a mistrial. In support of this claim, Lawlor relies on the affidavits of Chick, Meghan Shapiro, and Thomas Walsh, also members of Lawlor's defense team, who each aver that they heard the trial court loudly and sharply reprimand counsel.

The Court holds that this portion of claim (IX) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. Assuming the jury heard the trial

26

court's comments, Lawlor does not allege that the jury heard the rest of the bench conference and does not articulate how the jury would have known whether the judge was admonishing defense counsel or the prosecutor. In addition, the trial court had previously instructed the jury that they were to base their verdict solely on the instructions and the evidence, and that "no statement or ruling or remark I might make from the bench is intended in any way to indicate to you what my personal opinion might be." "It is presumed that a jury will follow the instructions given by the trial court." Muhammad, 274 Va. at 18, 646 S.E.2d at 195 (citation omitted); see also United States v. Lomax, 87 F.3d 959, 962 (8th Cir. 1996) (appellate court assumed that, even if jury overheard bench conference, they disregarded the information in compliance with the judge's instruction directing jury to consider only evidence presented at trial). Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

CLAIM (X)

In claim (X), Lawlor contends he was denied the effective assistance of counsel because, during the sentencing phase, counsel opened the door to the admission of evidence of Lawlor's abuse of his former fiancée, Amanda Godlove. Lawlor argues the Commonwealth elicited testimony from Godlove that Lawlor had abducted her in 1998, a crime for which he had been convicted, but did not elicit any testimony regarding Lawlor's relationship with or violence toward Godlove prior to the abduction. On cross-examination, Lawlor's counsel asked Godlove about her relationship with Lawlor

27

prior to the abduction, eliciting testimony from Godlove that Lawlor had anger control issues, Godlove only agreed to marry Lawlor because she was afraid to refuse his proposal, and she ended their relationship because she was afraid of Lawlor. On redirect, the Commonwealth elicited testimony about the tenor of Lawlor's entire relationship with Godlove, including specific acts of violence toward Godlove. Lawlor's counsel objected to this testimony, but the trial court found counsel had opened the door for the admission of the evidence through cross-examination. Lawlor contends this evidence, which included testimony that Lawlor sometimes went into a "white hot rage," that he had thrown an ashtray at Godlove, hit her, grabbed her, and twice choked her to the point of unconsciousness, would not have been admitted if not for counsel's error and that but for the admission of the evidence, the Commonwealth could not have proved the aggravating factor of future dangerousness and the jury would not have sentenced Lawlor to death.

The Court holds claim (X) fails to satisfy the prejudice prong of the two-part test enunciated in Strickland. The record, including the trial transcript, demonstrates that at the time the testimony complained of was admitted, Godlove had already testified that prior to the abduction, but after she and Lawlor had ended their relationship, Lawlor called her at work and approached her office, and as a result of Lawlor's behavior she felt the need to have two men escort her to her car every night when she left work "for [her] safety." Godlove testified she and her mother had established a routine whereby she would phone her mother every night when she left work, and her mother knew how long it would

28

then take Godlove to get home. Godlove would again call her mother as she approached the house, and upon arriving home Godlove would pull into the garage but stay in her car, with the windows rolled up, the doors locked, and her hand on the remote control for the garage door until the door had fully closed before getting out of her car. These measures were to ensure Godlove's safety. Godlove testified that on the evening of the abduction she had followed this routine, but when she got near her house she noticed a car which was not normally there and which matched the description she had of Lawlor's car. Godlove then called her mother and asked her to meet her at the door. Then she drove past her home to see if the car followed her. When it did not, she turned around and went home. She pulled into her garage and waited in her car, doors locked, windows rolled up, hand on the garage door opener, watching the door in the rear view mirror. Before the door closed, Lawlor rolled under it and approached the car, demanding to talk with Godlove. When she told him to leave, he got very angry and started banging on the car. Godlove's mother saw what was happening and told Lawlor she was going to call the police. According to Godlove's testimony "normally, that would be enough of a deterrent" but on this night Lawlor said he did not care. Godlove's mother opened the garage door and motioned to Godlove to drive away. When Godlove attempted to do so, Lawlor climbed onto the hood of the car and began hitting and kicking the windshield until he managed to put a hole in it. Lawlor reached through the windshield, turned off the car, opened the door, dragged Godlove out, threw her into his car, and drove away. Eventually, Lawlor's rage dissipated and he freed Godlove after she feigned a severe asthma attack.

29

Based upon this testimony, the jury knew Godlove was afraid of Lawlor long before he abducted her. Thus, Lawlor has failed to demonstrate that but for counsel's alleged errors, the result of the proceeding would have been different.

CLAIM (XI)

In claim (XI), Lawlor contends he was denied the effective assistance of counsel because counsel failed to elicit from Lawlor's therapist, Mary Fisher, evidence that Lawlor had reported to her that he had been sexually abused by his father. In support of this claim, Lawlor provides an affidavit from Fisher in which she avers she is a nurse practitioner specializing in psychological and mental health issues. She treated Lawlor in the fall of 2005, and she diagnosed Lawlor with poly-substance abuse, poly-substance dependence, and post-traumatic stress disorder (PTSD) as a result of being the victim of childhood physical and sexual abuse. Fisher avers that Lawlor disclosed to her in their initial meetings that he had been physically and sexually abused multiple times and that he had been sexually abused by his father. Fisher further avers that Lawlor suffered from flashbacks of being sexually abused by his father and of his sister being sexually abused by their father. Fisher further avers that she provided this information to Lawlor's defense team prior to trial. Lawlor contends that had the jury known he had been sexually abused by his father, there is a reasonable likelihood that the jury would not have sentenced him to death.

The Court holds claim (XI) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in Strickland. The record, including the trial transcript,

30

demonstrates that Fisher testified on Lawlor's behalf during the sentencing phase of his trial. Fisher testified that she had diagnosed Lawlor with PTSD, that such a diagnosis required at least one qualifying traumatic event in the patient's past, and that she had based her diagnosis of Lawlor, in part, on his "revelation of both physical and probable history of sexual abuse" of "himself and family members." When asked what that revelation of probable sexual abuse was, Fisher responded that the revelation was "innuendo that he also had a history of sexual abuse himself, . . . but I don't believe he ever specifically said that at that point until we terminated treatment."

Fisher further testified that in her initial meetings with Lawlor there was some "reference made to possible abuse by a peer, but it was not specifically addressed in the short time that we had to talk." Fisher went on to explain that when dealing with a new patient it was important to ask open-ended questions and establish a trusting relationship and that it is not unusual for a patient to initially deny having a history of sexual abuse. Fisher elaborated that she would not have expected Lawlor to immediately disclose all of the sexual abuse he suffered. Fisher further testified that Lawlor had specifically described flashbacks involving traumatic events with peers, and "violent incidents between he [sic] and his dad and his sister that he was involved in."

Finally, Fisher testified that toward the end of Lawlor's treatment, which lasted several weeks and spanned four to five sessions, she had referred Lawlor for inpatient treatment, for which he had been refused, and that during the intake procedure Lawlor reported he had a history of physical and sexual abuse by

31

someone he lived with after he ran away from home at the age of sixteen. Thus, despite being asked numerous open-ended questions by Lawlor's counsel, Fisher's testimony established that during her treatment of Lawlor, he never specifically stated he had been sexually abused, although he had suggested that might be the case, and that his suggestions of abuse involved peers, not his father. The first direct report of sexual abuse, according to Fisher's testimony, was in Lawlor's intake report. To the extent this testimony differs from Fisher's affidavit, this Court need not decide which is more credible. Counsel could reasonably have determined, based on Fisher's testimony at trial, that if asked directly if Lawlor had ever reported to her that he had been sexually abused by his father, Fisher's response would have been, "No." As Lawlor concedes, he had repeatedly attempted throughout the course of the trial to establish that he had been sexually abused by his father, and counsel could reasonably have determined that asking this question would have been more detrimental than helpful to his case. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

CLAIM (XII)

In claim (XII), Lawlor contends he was denied the effective assistance of counsel because counsel failed to present testimony from Dr. James Hopper, a clinical psychologist with expertise in the long-term effects of childhood abuse, who was appointed by the trial court to assist Lawlor. Lawlor contends that Dr. Hopper's testimony should have been presented as part of his mitigation

32

evidence to put Lawlor's prior bad acts and Orange's murder into context by showing Lawlor's criminal acts were rooted in the trauma he suffered during his childhood and adolescence. Lawlor further contends that Dr. Hopper's testimony should have been presented to show Lawlor's mental health and substance abuse treatment programs had been ineffective because they failed to address his underlying mental health issues, and to support the central mitigation theme that Lawlor was an abused and neglected child who turned to drugs and alcohol, that his violent acts had been the result of his addictions, and that he should not be sentenced to death.

Lawlor proffers that Dr. Hopper would have testified the abuse and neglect Lawlor suffered as a child negatively affected his ability to plan, make decisions, and regulate his emotions and behavior. Dr. Hopper would have testified that Lawlor's history of neglect and abuse and the resulting behavioral and interpersonal deficits led Lawlor to addiction and a cycle of sobriety and relapse, often involving criminal activity and incarceration, and this cycle was exacerbated by the lack of treatment for his underlying issues. Lawlor further proffers Dr. Hopper would have testified Lawlor's cocaine and alcohol binge on the night of the murder was an inevitable result of his initial success maintaining sobriety and a good job, which led him to distance himself from his support network and stop attending Alcoholics Anonymous (AA) meetings. When his grandmother and a friend subsequently died, Lawlor had completely isolated himself from his support network and began a downward spiral.

The Court holds claim (XII) satisfies neither the performance nor the prejudice prong of the two-part test enunciated in

33

Strickland. The United States Supreme Court has held that, in determining whether a petitioner has established prejudice based upon counsel's failure to present additional mitigation evidence, a reviewing court should consider whether a competent attorney, aware of the evidence, would have introduced it at sentencing and whether, had the jury been confronted with the evidence, there is a reasonable probability it would have returned a different sentence. Wong v. Belmontes, 558 U.S. 15, 20 (2009). In evaluating this second question, a reviewing court must consider all the relevant evidence the jury would have considered, not just the proffered additional mitigation evidence but also any rebuttal evidence the prosecution might have offered, and determine if the petitioner has shown "a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence." Id.

Here, the record, including the trial transcript, demonstrates that much of the mitigating evidence Lawlor faults counsel for failing to introduce was cumulative of the substantial mitigation evidence already introduced. Many witnesses, including Lawlor's family members, probation officers, and Mary Fisher, presented evidence that Lawlor was an abused and neglected child who turned to drugs and alcohol. Dr. Morton, Lawlor's expert psychopharmacologist, and Fisher presented evidence that individuals who suffer childhood trauma and have untreated psychiatric problems often turn to drugs and alcohol to "self-medicate," and that Lawlor's mental health and substance abuse treatment programs had been ineffective because they failed to address his underlying mental health issues. Morton and John

34

Sullivan, the clinical coordinator for Steps to Recovery, a program that Lawlor completed just months before he killed Orange, presented evidence that Lawlor's addictions had precipitated numerous violent acts. Morton and Sullivan also presented evidence regarding the cycle of addiction, sobriety, and relapse, and Morton explained how such cycles may be aggravated by untreated underlying psychiatric problems. The cumulative mitigating evidence Lawlor contends counsel should have introduced would not have aided Lawlor. See id. at 22 (finding no prejudice where petitioner's proffered mitigating evidence "was merely cumulative" of the mitigating evidence counsel had presented).

In addition, the record, including the trial transcript, demonstrates that some of the mitigating evidence Lawlor faults counsel for failing to adduce would have contradicted mitigating evidence that Lawlor had already introduced. Lawlor's mitigation witnesses testified Lawlor began to discontinue his participation in AA meetings as soon as he graduated from Steps to Recovery and his participation was no longer required. When Lawlor's friend died in July 2008, however, the circle of support he had generated while at Steps to Recovery was still available to him. Members of that circle gave Lawlor a ride to the memorial, called and encouraged him to go to AA meetings, and even went to Lawlor's place of employment to persuade him to do so. Steps to Recovery encouraged graduates to visit and held alumni nights once a month. Friends and members of Lawlor's church remained available to and supportive of him. The proffered expert testimony that Lawlor no longer had a support network available to him would have contradicted his own witnesses.

35

Further, the additional mitigation evidence Lawlor contends should have been introduced would have opened the door to rebuttal evidence from Dr. Hagan, who had examined Lawlor in accordance with Code § 19.2-264.3:1. The record, including Dr. Hagan's report, demonstrates that Dr. Hagan's rebuttal testimony would have been potentially damaging to Lawlor. It was Dr. Hagan's opinion that Lawlor was not suffering from severe emotional or mental disturbance at the time of the murder, and that Lawlor was fully able to appreciate the criminal nature of his acts and had the capacity to control his conduct, as evidenced by Lawlor's deliberate and strategic behavior in the hours leading up to the murder. It was Dr. Hagan's opinion that Lawlor's behavior toward others, especially women, was "entirely self-centered and devoid of empathy," that Lawlor appeared to have no real concept of guilt or remorse and had a "poor reputation for truthfulness," even among his biggest supporters, and that Lawlor often responded to rejection with "sudden, unpredictable and serious violence." Dr. Hagan noted that Lawlor had 40 or more services, programs, interventions, and treatment providers, as well as prescriptive care available to him between 1978 and 2008, and that he either turned down or failed to appear for other services. Finally, it was Dr. Hagan's opinion that while Lawlor's "dreadful developmental circumstances" contributed to his difficulties and shaped his character, interpersonal problem-solving ability, and patterns of emotional regulation, those circumstances did not cause his attack on Orange.

Considering all the relevant evidence the jury would have had before it, including the Commonwealth's rebuttal evidence, Lawlor

36

cannot show a reasonable probability the jury would have rejected a capital sentence had counsel submitted the proffered mitigation evidence. Nor, given the cumulative or conflicting nature of much of the evidence and the damaging nature of the Commonwealth's rebuttal evidence, was it unreasonable for counsel to decide not to submit this evidence. Thus, Lawlor has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

CLAIM (XIII)

In claim (XIII)(A) and a portion of claim (XIII)(C), Lawlor contends that, during the guilt phase of his trial, the evidence was in dispute whether he raped or attempted to rape Orange. Lawlor contends the jury verdict, under the indictment charging him alternately with capital murder in the commission of rape or attempted rape, left the dispute unresolved. Lawlor argues that because the question was unresolved, the prosecutor's questions and argument during the sentencing phase of the trial asserting that Lawlor had raped Orange were improper. Lawlor contends this confused the jurors and led them to presume he had raped Orange and to improperly base their sentencing decision on that presumption.

The Court rejects claim (XIII)(A) and this portion of claim (XIII)(C) because this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus. Slayton, 215 Va. at 29, 205 S.E.2d at 682.

In claim (XIII)(B) and a portion of claim (XIII)(C), Lawlor contends he was denied the effective assistance of counsel because

37

counsel failed to object to the prosecutor's improper questions and argument during the sentencing phase of trial. Lawlor contends that the prosecutor's questions to Lawlor's mitigation witnesses and closing argument improperly asserted that Lawlor had raped Orange, and that whether Lawlor had completed the rape was a question left unresolved by the jury's verdict. Therefore, Lawlor argues, any assertion that he was guilty of a completed rape was improper, and he was prejudiced by counsel's failure to object because the jury was likely to infer counsel conceded that he was guilty of rape.

The Court holds that claim (XIII)(B) and this portion of claim (XIII)(C) fail to satisfy the prejudice prong of the two-part test enunciated in Strickland. "Under Code § 18.2-31(5) willful, deliberate, and premeditated killing is capital murder if committed in the commission of or subsequent to either rape or attempted rape." Lawlor, 285 Va. at 222, 738 S.E.2d at 866. The jury was permitted to find Lawlor guilty if it found either predicate. Id. at 222, 738 S.E.2d at 867. The sentencing phase jury was composed of the same jurors who convicted Lawlor during the guilt phase of trial. Consequently, the jurors knew during the sentencing phase which predicate they had found in the guilt phase. Lawlor therefore cannot establish that he was prejudiced by the prosecutor's references to rape. Thus, Lawlor has failed to demonstrate that, but for counsel's alleged errors, the result of the proceeding would have been different.

38

CLAIMS (XIV) & (XV)

In claim (XIV) and a portion of claim (XV), Lawlor contends the cumulative effect of counsel's deficient performance undermines confidence in the jurors' decision.

The Court holds that claim (XIV) and this portion of claim (XV) are without merit. As addressed previously, Lawlor has failed to demonstrate prejudice as a result of counsel's alleged errors. "Having rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel." Lenz v. Warden of the Sussex I State Prison, 267 Va. 318, 340, 593 S.E.2d 292, 305, cert. denied, 542 U.S. 953 (2004).

In the remaining portion of claim (XV), Lawlor contends the cumulative effect of trial errors produced a trial that was fundamentally unfair, thereby depriving him of his constitutional right to due process.

The Court holds that this portion of claim (XV) is barred because this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus. Slayton, 215 Va. at 29, 205 S.E.2d at 682.

Upon consideration whereof, Lawlor's motion to make the joint appendix from the direct appeal part of the record is granted. Lawlor's motions for discovery, for expert assistance, and for an evidentiary hearing are denied.

39

Upon consideration of Lawlor's motion to strike the Warden's evidence and the Warden's motions to strike Lawlor's affidavits, the motions are denied.  The exhibits and affidavits are considered pursuant to the appropriate evidentiary rules.

Upon consideration of the Warden's motions to amend the motion to dismiss and to file a supplemental affidavit, the motions are granted.

Accordingly, the petition is dismissed and the respondent shall recover from petitioner the costs expended in his defense herein.

This order shall be published in the Virginia Reports.

Respondent's costs:

    Attorney's fee          $50.00

A Copy,

Teste:

Patricia L Harrington

Clerk

40